**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Srinivasan Vasudevan, | ) | **Case Number:** 1:26-cv-211 |
| *Plaintiff,* | ) | **Judge:** Matthew F. Kennelly |
| | ) | **Magistrate Judge:** M. David Weisman |
| v. | ) | |
| | ) | |
| The University of Chicago, Local 73 of | ) | |
| the Service Employees International | ) | |
| Union, Matthew Carpenter, Bridget | ) | |
| Collier, Ingrid Gould, Margaret (Peggy) | ) | |
| Harper, Jeff Jackson, Katherine (Katie) | ) | |
| Kaftanich, Min Sok Lee, Brett Leibsker, | ) | |
| Victor Lima, Sherry Manick, Derek | ) | |
| Neal, Shayla Nguyen, Howard Nusbaum, | ) | |
| Elizabeth (Betsy) Noel, Wesley Payne, | ) | |
| Eric Richert, Azeem Shaikh, Scott | ) | |
| Velasquez, Anneliese (Anna) Wermuth, | ) | |
| Amanda Woodward, and Kotaro | ) | |
| Yoshida, *Defendants.* | | |

**Part A: Introduction**

***Jurisdiction and Venue***

1.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Plaintiff asserts claims arising under the laws of the United States, including the Labor Management Relations Act, 29 U.S.C. §185, and the Family and Medical Leave Act, 29 U.S.C. §2601 et seq.

1

2.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. §1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

### *Parties*

4.     Plaintiff is an individual who has been employed by the University of Chicago ("University") as an Other Academic Appointee ("OAA") since September 1, 2019, and holds the title of Assistant Instructional Professor in the Kenneth C. Griffin Department of Economics and the College at the University of Chicago.  Plaintiff is a citizen of India and lawfully present and employed in the United States under an H-1B visa.

5.     Azeem Shaikh, Ralph and Mary Otis Isham Professor, is the Chair of the Kenneth C. Griffin Department of Economics ("Department") since July 1, 2024, and has been employed by the University since 2007.

6.     Victor Lima is Senior Instructional Professor ("SIP") in the Department and Co-Director of Undergraduate Studies and Master's Programs.  He received his Ph.D. in Economics from the University in 2001 and has since been employed by the University as an academic appointee.

7.     Kotaro Yoshida, Associate SIP, is Co-Director of Undergraduate Studies in the Department. Yoshida has been employed by the University since 2012.

8.     Min Sok Lee, Associate SIP, is Co-Director of Master's Programs in the Department. Lee received a Ph.D. in Economics from the University in 2008 and has been employed by the University since 2015.

9.     Amanda Woodward, William S. Gray Distinguished Service Professor of Psychology, is the Dean of the Social Sciences Division ("SSD") of the University since 2017.  Woodward

2

has been a faculty member at the University of Chicago since 1993.

10. At all relevant times, Shaikh, Lee, Lima, Woodward, and Yoshida exercised supervisory authority over Plaintiff.

11. Derek Neal, William C. Norby Professor of Economics, was employed by the University from 1991 to 1997 and again since 2001.

12. Eric Richert, Assistant Professor in Economics, has been employed by the University since 2023.

13. Lee, Lima, Neal, Richert, and Yoshida conducted Plaintiff's performance review for progression from Assistant Instructional Professor ("AIP") to Associate Instructional Professor ("progression review"), and conducted Plaintiff's classroom observation as part of the progression review.

14. Elizabeth (Betsy) Noel is Director of the Office of College Community Standards in the College ("OCCS") and handled Plaintiff's reports of academic and behavioral misconduct in his courses. Noel has been employed by the University since 2024.

15. Howard Nusbaum, Professor of Psychology, was Master of SSD from July 2021 to about April 2026. Nusbaum has been a faculty member at the University of Chicago since 1986.

16. Jeff Jackson is Assistant Provost for Academic Affairs at the University and has been employed by the University since 2015.

17. Nusbaum, Woodward, and Jackson, as designee of Katherine Baicker, Provost of the University, exercised ultimate authority over Plaintiff's progression.

18. Ingrid Gould is Senior Associate Provost at the University. Gould received a B.A. and an M.A. from the University and has been employed by the University for approximately thirty (30) years.

19. Margaret (Peggy) Harper is Chief of Staff and Associate Dean for Academic Planning in SSD. Harper has been employed by the University for approximately seventeen (17) years.

20. Katherine (Katie) Kaftanich was Assistant Dean for Academic Affairs in SSD from about October 2024 to about April 2025. Kaftanich has been employed by the University since 2008.

21. Brett Leibsker is Assistant Vice President of Human Resources ("HR"). Leibsker has been employed by the University since 2018.

22. Sherry Manick is the Director of Finance, Operations, and Personnel in the Department. Manick has been employed by the University for approximately twenty (20) years.

23. At all relevant times, Gould, Harper, Kaftanich, Leibsker, and Manick exercised administrative authority over Plaintiff.

24. Bridget Collier is Associate Provost for Equal Opportunity Programs ("EOP")–Title IX Coordinator for the University, Affirmative Action Officer, and Section 504/ADA Coordinator–at the University. Collier has been employed by the University since 2015.

25. Scott Velasquez is Executive Director of the Office for Equal Opportunity & Access and Deputy Title IX Coordinator at the University. Velasquez has been employed by the University since 2018.

26. At relevant times, Collier and Velasquez handled Plaintiff's accommodation requests under the ADA and Collier and Gould handled Plaintiff's Title IX complaints.

27. Plaintiff is a member of the bargaining unit known as UChicago Faculty Forward ("Bargaining Unit"), for which Local 73 of the Service Employees International Union ("SEIU Local 73") ("Union") is the exclusive bargaining representative.

28. During the relevant period, Shayla Nguyen was Staff Attorney at the Union and represented Plaintiff in matters relating to grievance processing, arbitration-related proceedings, and settlement communications.

29. During the relevant period, Wesley Payne was Staff Attorney at the Union and represented Plaintiff in matters relating to grievance processing, arbitration-related proceedings, and settlement communications.

30.     Matthew Carpenter is General Counsel of the Union and, during the relevant period, represented Plaintiff in matters relating to grievance processing, arbitration-related proceedings, and settlement communications, and supervised Nguyen and Payne.

31.     Anneliese (Anna) Wermuth is Vice-Chair of the Labor & Employment Department of Cozen O'Connor P.C. and, during the relevant period, represented or advised the University in matters relating to Plaintiff.

**Part B: Chronology of Facts**

32.     On March 27, 2019, Plaintiff received an offer for the role of Lecturer in the University of Chicago Department of Economics from Manick on behalf of Robert Shimer, then Department Chair. On April 8, 2019, Plaintiff accepted a revised offer. Plaintiff's first appointment ran from September 1, 2019 through August 31, 2021 and was governed by the applicable collective bargaining agreement and University policies. On August 30, 2019, Kaftanich informed Plaintiff that the University Senate had changed the Lecturer title and that Plaintiff's rank would henceforth be Assistant Instructional Professor ("AIP").

*First Reappointment (2021-2023)*

33.     In Fall Quarter 2020, Lee, Lima, and Yoshida observed Plaintiff's lecture remotely during the period of University remote instruction as part of his performance review for reappointment ("reappointment review"). Yoshida later sent Plaintiff a written observation report that was generally positive and provided guidance for further professional development.

34.     Lee, Lima, and Yoshida then met with Plaintiff to discuss the observation. During that meeting, Lima praised Plaintiff's student engagement, and Lee stated that Plaintiff was performing well in his administrative and advising responsibilities in the Master's programs.

35.     In Winter Quarter 2021, Plaintiff followed up with Yoshida regarding the status of his reappointment review. Yoshida told Plaintiff that there had been pushback from the Dean's

Office concerning reappointment, based on concerns about Plaintiff's Winter Quarter 2020 student course evaluations.

36.    Later that quarter, Manick informed Plaintiff that the Department and SSD had placed him on a performance improvement plan ("PIP"). As part of the PIP, Plaintiff delivered a mock lecture for evaluation and later submitted a written account of his efforts to improve his pedagogy. At the conclusion of the remediation period, the Department informed Plaintiff that he had successfully completed the PIP. In the closure report, the Department stated that Plaintiff had improved in most identified areas and that his pedagogy had improved substantially.

37.    Following successful completion of the PIP, Plaintiff was reappointed for the period from September 1, 2021 through August 31, 2023.

38.    Beginning in 2021, Plaintiff encountered irregular and discretionary administrative handling of both immigration-related and research-related matters. Plaintiff's lawful permanent residence process was paused without explanation, Plaintiff's H-1B extension was later processed for a shorter period at Manick's request, and a later internal research award requiring subcontracting was delayed until Plaintiff escalated the matter and pursued repeated follow-up, narrowly avoiding interruption of the project.

### *Staff Meeting with Department Chair*

39.    In May 2022, Shimer met with Assistant Instructional Professors to discuss concerns about their treatment in the Department. During that meeting, Shimer acknowledged concerns about how AIPs were being treated and stated that conditions would improve.

40.    During the same meeting, Shimer stated that he was aware that "Sherry [Manick] talked down to IPs" and that he had been under the impression that "Victor [Lima] was doing a good job."

41.    Some changes followed during the next academic year, including regular meetings with AIPs, but those meetings were later canceled repeatedly during the following academic year.

42.   In October 2022, Lee stated that the expectation was that Plaintiff be present in the office Monday through Friday during regular working hours, without identifying any governing written policy. When Plaintiff asked that any such expectation be uniformly communicated and applied to all instructional professors, Lima and Yoshida met with Plaintiff, stated that Plaintiff should have sought permission, and declined to issue any general announcement.

43.   In 2023, Lima, Lee, and Yoshida directed Plaintiff to discontinue several instructional practices he had understood to be permissible, including using two examinations instead of a traditional final examination, weekly online quizzes, and memory aids as class-wide practices. After a student confessed to cheating on a weekly quiz, Lima and Yoshida criticized Plaintiff's use of quizzes, stated that Plaintiff had "created the conditions" for the cheating, discouraged Plaintiff from reporting the incident to the Dean of Students, and later requested Plaintiff's course materials and grade distributions for audit. Plaintiff discontinued those practices despite objection.

### *Admissions Review Processes and Directives*

44.   In January 2023, Lee and Lima instructed instructional professors on a revised admissions-review process for the Master's program. During that process, Lima and Lee directed reviewers to use only "stock phrases" in admissions comments rather than detailed explanations as previously required, discouraged maintenance of spreadsheets as previously practiced, and rejected a suggestion that reviewers obtain guidance from University counsel regarding the changed process.

45.   Later that month, after Plaintiff and a co-reviewer reported discrepancies in their recommendations, as required by the communicated admissions-review process, Lee and Lima directed Plaintiff to meet with them.

46.   At that meeting, Lee and Lima directed Plaintiff to alter his recommended decisions for two applicants on the stated basis that the applicants' transcripts should be heavily discounted because they were from particular public universities.

47. Plaintiff objected that altering admissions recommendations on that basis was inconsistent with fair admissions review and institutional standards.

48. Despite that objection, Emma Rubinstein, Student Affairs Administrator for MAPSS-Econ and MACSS-Econ in the Department, directed Plaintiff to enter the altered decisions promptly.

49. Plaintiff complied despite objection.

50. In Fall Quarter 2022, Lee, Lima, and Yoshida observed Plaintiff's lecture as part of his second reappointment review and later provided a written observation report. During the related meeting, Lima and Yoshida criticized Plaintiff's use of slides and urged him to return to board work. Plaintiff explained that he had shifted to slides because students had complained about the pace and legibility of his handwriting and because student satisfaction and learning had improved after that change.

51. When pressed further, Plaintiff disclosed functional limitations relating to handwriting and managing multiple movable blackboards. Lee, Lima, and Yoshida responded to those concerns with laughter. Notwithstanding that treatment, the University reappointed Plaintiff for the term September 1, 2023 through August 31, 2025, and later stated in writing that Plaintiff's teaching had improved and that his classroom performance represented a significant improvement over the prior review.

### *Report of Academic Misconduct During the Summer Session, 2024*

52. On July 11, 2024, Plaintiff discovered suspected academic misconduct by three students in his Summer Session 2024 course and contacted the students for an explanation, as required by OCCS policy. Plaintiff's concern was based on the substance of the submission, which reflected technical material not taught in the course and did not match the assigned question.

53. That same day, Plaintiff reported the matter to Lima, Julie Wong, Undergraduate Student Affairs Administrator in the Department, and the students' academic advisors. One student provided an explanation that Plaintiff found credible. The two remaining students,

Danny Kalarical and Aaleyah Vaughn, denied wrongdoing and declined requests to meet and clarify the matter.

54.     On July 12, 2024, Vaughn accused Plaintiff of discrimination and threatened to seek Plaintiff's termination, stating, "AND IF YOU STILL HAVE A JOB AFTER THE SCHOOL FINDS OUT THAT I'VE FILED A DISCRIMINATION SUIT I'D BE VERY SUPRISED."

55.   Noel encouraged Plaintiff to submit a formal academic-misconduct and a behavioral-misconduct report, advised him not to communicate further with the students directly, and discussed whether Vaughn's conduct should also be reported as behavioral misconduct.

56.     After Plaintiff submitted a draft report to Lima, who approved it, Plaintiff formally submitted it to OCCS. Several weeks later, Lima informed Plaintiff that Noel would not refer the matter to the disciplinary committee and that there would be no appeal. In contemporaneous communications, Noel stated that Vaughn's July 12, 2024 email constituted protected activity and would not be referred for disciplinary review.

57.     After OCCS declined to proceed, Plaintiff sought clarification from Noel regarding grading implications and received contradictory explanations. Lima then directed Plaintiff regarding the grades to assign, told Plaintiff to hold off on posting grades, and later directed Plaintiff to revise a student's grade notwithstanding Plaintiff's academic judgment as instructor of record.

***Start of Progression Review and Classroom Observation***

58.     Article 18, Section 5 of the Third CBA, sets forth procedures governing the Lecturer performance review process, including classroom observation.[1] The relevant provisions include:

(a)   A. Each academic unit will identify an observer who has training, knowledge of the subject matter (to the extent possible), and experience appropriate to observe the Lecturer,

---

[1] Article 16 of the First and Second CBAs set forth procedures identical to those set forth in Article 18 of the Third CBA.

and notify the Lecturer of the identity of the observer at least fourteen (14) calendar days in advance of a scheduled observation.

(b)   B. The time and date of the observation shall be designated in advance by mutual agreement between the observer and the Lecturer.

(c)   E. Prior to the observation, the Lecturer may provide to the observer the framework, plan, and intent of the class.

(d)   F. The observer will prepare a written report within two (2) weeks of the classroom observation and submit a copy of the report to the academic unit head and the Lecturer. Upon request of the Lecturer or the observer, the observer will meet with the Lecturer within two (2) weeks of submitting the report to discuss the Lecturer's performance in the classroom during the observation and the content of the observation report.

(e)   G. A Lecturer may prepare a written response to the observer's written report within two (2) weeks of the Lecturer's receipt of the report and submit it to the observer and academic unit. Any such response shall be maintained as part of the report materials. The academic unit shall review the response with the Lecturer and may decide to conduct a new observation, or let the written report stand without modification.

59.   On June 13, 2024, Lee, Lima, and Yoshida met with Plaintiff regarding the progression review to occur in Fall Quarter 2024. Lima stated that he advised instructional professors up for progression to go on the job market, raised ambiguity about entitlement to a terminal seventh-year contract in the event of non-progression, and expressed interest in writing a recommendation letter for Plaintiff.

60.   Lima stated that Plaintiff's flagship course, "Econ 15500: Introduction to Development," might be discounted as duplicative and that the Department's current need was for more business- and finance-related courses. When Plaintiff asked whether he could develop and teach such a course during the progression-review year as a signal of ability and performance, Lima responded that the next year's course assignments had already been decided but that Plaintiff could address the matter in his personal statement.

61. When Plaintiff asked about potential observers, Lima identified Neal as a possible observer for Econ 20100. Plaintiff had previously been told by a former AIP that, during that former AIP's progression-review observation, Neal had walked out of the lecture after about fifteen minutes and that the former AIP expected to be fired. Plaintiff then stated that he would instead choose Econ 11020 for the observation. Lee, Lima, and Yoshida observed Plaintiff's reaction, and Lima added that Neal had also taught Econometrics.

62. Yoshida stated that he would begin requesting review materials over the summer and Fall Quarter. Lima stated that Lee, Lima, and Yoshida would draft the observation report, after which the faculty would finalize the report, vote, and transmit the recommendation and materials to Dean Woodward, whom Lima stated was closely engaged in the process. Lima further stated that faculty support letters were not usually considered but that he would confirm; Plaintiff received no follow-up confirmation.

63. Just before Fall Quarter 2024 began, Yoshida asked Plaintiff to propose a class for observation by Lee, Lima, and Yoshida as part of Plaintiff's progression review. Plaintiff proposed an Econ 11020 class, and Yoshida later rescheduled the observation for October 22, 2024.

64. On October 10, 2024, Shaikh asked Neal and Richert to serve on Plaintiff's progression review committee. Neal initially indicated reluctance because he was on leave and had other obligations, and Manick responded that Neal could skip the observation. Yoshida nevertheless intervened, stating that Neal was needed because it was Plaintiff's "promotion review."

65. Yoshida informed Plaintiff only verbally, on October 20 or 21, 2024, that Neal and Richert would also observe the class. At that time, Plaintiff also reminded Yoshida of logistical preferences intended to minimize disruption, based on prior observation experience.

66. While the lecture was still ongoing, Neal emailed Lee, Lima, and Yoshida that he had "seen enough to make a judgement" and stated that, although the lecture was not as bad as another redacted example, it was "not good enough" and that "probation with a remediation

11

plan is the best possible outcome."

67.    Richert separately submitted notes criticizing aspects of the lecture, but also stated that Plaintiff questioned students effectively, that students responded well, and that they appeared comfortable participating in the class.

68.    During the drafting of the observation report, Neal circulated an email proposing harsh language, including that Plaintiff had shown a "Lack of Effort," had been "too damned lazy," and that "the key point is that we need to fire this guy." Neal further wrote that Plaintiff "must go."

69.    The observation and resulting report later became central to Plaintiff's grievance proceedings, the non-progression decision, and later republication of statements about Plaintiff's competence.

70.    On October 30, 2024, at 6:12 p.m., Yoshida emailed Plaintiff the classroom observation report and stated that a "debrief meeting" would occur the next day at 4:00 p.m. The email stated that the report would "help to frame the discussions" and that Plaintiff could respond in writing within two weeks.

71.    On October 31, 2024, Plaintiff attended the debrief meeting with Lee, Lima, and Yoshida. Neal and Richert–the other observers–did not attend.

72.    Plaintiff stated that he had received the nine-page report only the previous evening and, after a full day of teaching, had not had an opportunity to read it fully. Plaintiff asked for the reviewers' overall observations about his lecture and his performance in the progression review.

73.    Lima responded, "Everything we want to convey is in the report we shared. Please read it carefully and digest it, and if you want, reach out if you have any specific questions." Yoshida then stated that Plaintiff had fourteen days from the day before to submit a written response to the report for inclusion in his review materials.

74.    On November 14, 2024, Plaintiff submitted a written response to the observation

12

report to Lee, Lima, Neal, Richert, Yoshida, and Manick.

75. In that response, Plaintiff addressed the report's principal criticisms, including its treatment of his course design, use of simulated data, use of slides rather than board work, content coverage, teaching demeanor, business-relevant examples, and technical statements concerning regression analysis. Plaintiff explained that the course relied extensively on real-world datasets, that slides had been adopted in response to prior feedback and functional limitations relating to handwriting, and that several criticisms in the report were inaccurate or lacked context.

76. Plaintiff submitted the response pursuant to the CBA process and to ensure that his rebuttals to the observation report would be considered before any progression decision. The response was later omitted from the materials presented to faculty in connection with the progression vote.

77. On November 18, 2024, Plaintiff emailed Neal to request a meeting. Neal responded, "I am glad to talk. However, you should know ex ante that I am firmly convinced based on your performance in the lecture I observed that your contract should not be renewed. If you are looking for someone to support some sort of appeal, I am not the right guy."

78. Later that day, Neal stated that he had already read Plaintiff's written response to the observation report. Neal nevertheless maintained a fixed negative position, including stating, "Now that I think about it, you were more interested in not making mistakes than teaching the class."

79. When Plaintiff mentioned the excessive length of the observation report, Neal responded, "Blame the idiots among your peers and in the University that insisted on unionizing this stuff. We have to cover our own butt and write these nine-page things." Neal further stated, "There's no way in hell that I'm going to let them renew your contract. I will make 100% sure that my recommendation is respected."

80. On November 19, 2024, Neal wrote to Lima, with Richert and Yoshida copied, that all five reviewers had a negative opinion of Plaintiff's performance and opposed renewal, and

13

that Neal would make "100% sure" that the Department followed that recommendation. Neal further wrote: "By the end, I was convinced that he does not only give bad lectures, he is simply not a well-trained economist who thinks carefully."

*First Union Grievance Against Procedural Defects in Conduct of Classroom Observation*

81. On November 21, 2024, Plaintiff met with Shaikh to discuss Plaintiff's progression review and the classroom observation process.

82. At that meeting, Plaintiff identified defects in the classroom-observation process that violated the CBA and explained that the observation report contradicted instructions and directives Plaintiff had previously received from Lee, Lima, and Yoshida. Shaikh stated that he was not aware of the relevant CBA provisions.

83. Plaintiff stated that a new classroom observation conducted in compliance with the CBA would be an acceptable resolution. Plaintiff also stated that he intended to file a grievance and asked Shaikh not to be offended. Shaikh responded that he understood those to be important worker protections.

84. Plaintiff also relayed that Neal had stated he would see through Plaintiff's "non-renewal." Shaikh responded that it was "empirically not true" that Neal's recommendations were always respected.

85. Shaikh assured Plaintiff that the full review packet would be carefully read by the Department. Plaintiff specifically asked that his response to the observation report be read, and Shaikh said that it would be. Plaintiff also informed Shaikh that AIPs who did not progress received a terminal seventh-year appointment, and Shaikh stated that he was not aware of that CBA provision.

86. Plaintiff also raised that he had not received a deadline for his personal statement, and Shaikh stated that he would follow up with Manick.

87. After the meeting, Plaintiff emailed Shaikh requesting as the sole remedy that the

14

classroom observation be redone in accordance with the CBA, and informed him that Plaintiff had sought a reasonable accommodation through EOP regarding board work and slides.

88.    Shaikh did not respond, did not provide the requested personal-statement deadline, and did not arrange a new observation.

89.    On November 21, 2024, Plaintiff filed the First Grievance. The grievance as submitted by the Union contained obvious errors: Plaintiff's name was entered as "Srinivasan Vasubevan" in the "Name of the Employee" field, a different individual was identified as the grievant in the "Statement of Grievance" field, and the grievance omitted Richert as an additional observer.

90.    The grievance asserted that the classroom observation had been conducted without the fourteen (14) days' advance notice of observer identity required by the CBA.

91.     On December 4, 2024, Plaintiff and Loren Ezra Whitman, Union Representative, attended a grievance meeting with Kaftanich and Leibsker. Plaintiff reiterated that the sole requested remedy was a new classroom observation conducted in compliance with the CBA. In the University's Step 3 Answer, signed by Leibsker, the University acknowledged that "Article 16.B.A does require that lecturers are notified of the identity of observers at least fourteen (14) calendar days prior to the observation,"[2] but argued that Plaintiff "was aware of at least three" observers and that the University was "not convinced [Plaintiff's] preparation or lesson plan would have changed" had he known about Neal and Richert earlier.

92.    The same Answer further stated that "[t]he CBA does not specify what the remedy is when a procedural technicality occurs in the observation process," characterized Plaintiff's requested remedy as unreasonable, and denied the grievance.

### *Title IX Complaints*

93.     On March 5, 2025, Plaintiff disclosed the regular, recurring conduct of organized gatherings called "Liquidity Seminar" in Yoshida's office, involving on-campus consumption

---

[2]The University's Step 3 Answer cited "Article 16" of a prior CBA rather than Article 18 of the Third CBA, which governed Plaintiff's progression review.

of alcohol that Plaintiff believed was inconsistent with the University's alcohol policy and potentially created risks from impaired driving after the gathering.

94. On March 6, 2025, Shaikh forwarded Plaintiff's disclosure to Woodward, stating, "in light of what else is going on, i thought it may be a good idea to have brett liebsker advise us on how to respond." Woodward responded, "This is a very serious set of allegations. Thank you for bringing them to my attention. I'll loop in Bridget Collier and Brett [Leibsker] (because of the IP union)."

95. On the same day, Woodward emailed Leibsker and Collier, copying Shaikh and Harper, regarding how to proceed, stating,

> Hello again Bridget and Brett, Peggy and I had the opportunity to talk with Azeem and learn the context. I've asked Peggy [Harper] (new Chief of Staff/Associate Dean in SSD) to work with you and Azeem around the appropriate responses to this note.

96. On March 7, 2025, Gould emailed Shaikh with the subject line "green light," indicating internal approval of the proposed response plan.

97. On March 10, 2025, Gould and Shaikh met with Plaintiff to discuss the disclosure. Plaintiff provided testimony during the scheduled thirty-minute meeting. On March 13, 2025, Gould sent an internal email with the subject line "tempest in a teapot" discrediting Plaintiff's testimony and disparaging Plaintiff.

98. On March 19, 2025, Plaintiff submitted additional materials he had offered to provide during the meeting. On April 17, 2025, Plaintiff received a formal outcome letter describing the complaint and the investigation conducted by Gould and Shaikh, ultimately dismissing it. The letter suggested that Gould and Shaikh had not interviewed any witnesses or reviewed the University's detailed Alcohol Use Policy.

99. On May 21, 2025, Yoshida emailed the instructional professors with the subject line "liquidity seminar tomorrow."

100. On January 5, 2026, quoting the email with the subject "tempest in a teapot" and including the original recipients–Leibsker, Woodward, Harper, and Shaikh–Plaintiff objected to Gould's characterization of his March 10, 2025 testimony, described the characterization as objectionable, and requested that Gould and Shaikh correct the record.

101. On January 6, 2026, after receiving no response, Plaintiff emailed the same recipients his transcript of the March 10, 2025 meeting and asked Gould and Shaikh to correct it if inaccurate. No corrections were provided.

102. Plaintiff also copied Collier for further action. On January 14, 2026, Collier dismissed Plaintiff's request for further action, stating: "My office oversees the University's non-discrimination and harassment policies..." Plaintiff reiterated that his complaint did allege discriminatory conduct in materials already provided to the University, and Collier stated that Plaintiff could submit those materials to her, which Plaintiff promptly did.

103. On January 21, 2026, Plaintiff shared with Collier, as a Mandated Title IX Reporter, credible information that Neal had engaged in discrimination based on gender by reportedly stating that he would not advise female students because of "Me Too." Plaintiff later met with a staff member from Collier's office to provide formal testimony and was informed that he would not receive updates because he was not a Complainant.

104. On January 26, 2026, in relation to the earlier complaint, Collier stated:

> I have carefully reviewed the materials you provided in full and determined that these concerns do not implicate the University's non-discrimination policies. Specifically, the materials show that the workplace gatherings are open to all, and while they may include the option to consume alcohol, it is not a requirement for those who choose to attend.
>
> In light of this determination, no further action will be taken.

105. On February 27, 2026, Plaintiff sent a summary of the report related to Neal that he had sent to the Title IX Office to Shaikh, who acknowledged the concern and thanked

17

Plaintiff for sharing it.

*Second Union Grievance Against Procedural Defects in the Conduct of the Progression Review*

106.    Article 18, Section 4 of the Third CBA sets forth procedures governing the Lecturer performance review process.[3] The relevant provisions include:

  (a)    D. The University shall notify the Lecturer of the identities of the individuals performing the review three (3) weeks prior to the time of the review. If the University has good cause to substitute, it may do so and will inform the Lecturer of the change in a timely manner.

  (b)    E. The Lecturer may submit a response to any review, and that response shall be appended to the review and included in their personnel file.

107.    On January 7, 2025, Manick instructed Plaintiff to submit his personal statement by January 10, 2025. Plaintiff objected that he had repeatedly requested the deadline throughout Fall Quarter 2024 without receiving a clear response. Manick then extended the deadline to January 21, 2025, and Plaintiff submitted the statement within that deadline.

108.    Plaintiff understood that his personal statement, together with support letters received from students and faculty, would be included in the review "case" and considered by the Department faculty before the progression vote, consistent with Shaikh's earlier assurances that the full packet would be read.

109.    On February 14, 2025, Kaftanich emailed Lima, Manick, and Yoshida:

> Working on a few more issues with Srini.
>
> Can either of you tell me when Srini was notified that Derek and Eric would join?
>
> And why were there five observers? I also just met with Brett and our attorney
>
> [, Wermuth] has advised holding another observation with two observers. We

---

[3]Article 16 of the First and Second CBAs set forth procedures identical to those set forth in Article 18 of the Third CBA.

would remove the other observation from the report and make no mention of handwriting in the new one. It's not ideal but if we do another observation, Srini won't have this in his arsenal when he ultimately files a grievance for non-progression. Let me know if you have time to quickly do another observation. We would still need to give him 14 days notice.

110. On February 26, 2025, after receiving no update regarding the status of the progression review and no clear disclosure of the identities of the individuals performing the review, Plaintiff followed up with Manick and Kaftanich.

111. On March 3, 2025, Kaftanich stated, "I'm a bit confused by your email. Your performance review is complete and with the Provost Office for final review," and further stated, "You were notified of the individuals conducting the review over the summer when you met with Kotaro and Victor." After Plaintiff clarified that he had not been informed of those identities at the June 13, 2024 meeting, Kaftanich later stated, "The individuals that preformed (*sic*) the review were Victor Lima and Kotaro Yoshida," omitting Lee, Neal, and Richert.

112. After that exchange, Plaintiff requested the progression review report or memorandum so that he could respond as permitted by the CBA. Kaftanich declined to provide the progression review report stating Plaintiff had declined to receive it at the meeting with Lee, Lima, and Yoshida on October 31, 2024.

113. On March 11, 2025, Plaintiff emailed Shaikh stating that his "progression review had gone off the rails" and requested a meeting to discuss an informal and amicable resolution without further grievance proceedings if possible. Shaikh suggested that Kaftanich join the meeting, and the meeting occurred on March 13, 2025.

114. After the meeting, Kaftanich summarized that Plaintiff believed he met the standards for progression, wished to remain in the Department, and was also open to alternative positions at the University. Kaftanich stated that she and Shaikh would explore possible paths forward, coordinate with Human Resources and the Provost's Office, and remain in

contact regarding next steps.

115.    Plaintiff received no follow-up communications. On April 11, 2025, the Bargaining Unit was informed that Kaftanich had left SSD.

116.    On April 4, 2025, Plaintiff received an email from Shaikh stating that Plaintiff had not met the standard for progression and attaching Plaintiff's terminal-year contract, which Plaintiff was instructed to sign and return within fourteen (14) days.

117.    On April 21, 2025, Plaintiff filed the Second Grievance challenging the performance review process.  After following up on April 28 and again on May 1, 2025, Plaintiff was informed that Whitman had submitted the grievance to the University the previous day.  The grievance asserted that the University had failed to comply with CBA provisions governing notice of reviewer identities and the opportunity to submit a written response before a final decision, and requested that the review be redone by different reviewers in compliance with the CBA and that, if the second review again resulted in non-progression, Plaintiff receive a terminal-year contract for the following academic year (2026–2027).  The grievance form also contained a typographical error entering Plaintiff's name as "Srunivasn Vasudevan" in the "Settlement Desired" field.

118.    On April 30, 2025, Plaintiff attended a grievance meeting with Shaikh and Harper, to which Lima was added without prior notice.

119.   During the meeting, Shaikh did not provide substantive reasons for the non-progression decision. When Plaintiff stated that many of the technical criticisms in the classroom observation report were inaccurate and requested clarification, Shaikh responded, "I would argue they are accurate. However, discussing that may not be the best use of our time now."

120.    Plaintiff also stated that he had never received the progression review report for response as required by the CBA. Lima repeatedly disrupted the discussion by asserting that Plaintiff had been denied the report because Plaintiff had "walk[ed] out of the debrief meeting" on October 31, 2024, and by stating that responsibility for providing the report lay with the Dean's Office. Harper and Shaikh declined to share the progression review report,

as mandated by the CBA.

121.    On May 1, 2025, in an email to Lima, with Harper and Shaikh copied, Leibsker relayed internal discussions with Wermuth and the Union, writing:

> Because attempts to reason with Srini have failed, Anna [Wermuth] can relay to the attorney our responses to the allegations in the hopes the attorney can speak with Srini and convince him he will never be progressed and to look for other ways to settle this.

122.    On May 12, 2025, Plaintiff emailed Provost Baicker, requesting a Step 3 grievance meeting, copying Jackson, who had signed Plaintiff's terminal-year contract. Plaintiff received no response and was not provided a Step 3 meeting.

### Progression Review Materials Released to the Union

123.    In July, 2025 Plaintiff received his progression review materials from the Union, containing the information document below.

124.    On January 13, 2025, in advance of the faculty meeting at which Plaintiff's progression case was to be voted on, department faculty received an email containing Plaintiff's curriculum vitae, a memorandum by the performance review committee (the "Committee's Memo"), and the October 22, 2024 Observation Report. The Committee's Memo stated that Plaintiff's response to the Observation Report would be appended, but it was not.

125.    On or about January 21, 2025, Shaikh distributed a memorandum dated January 12, 2025 (the "Chair's Memo") to Woodward and Nusbaum under the subject line, "Request not to promote Srini Vasudevan to Associate Instructional Professor." The Chair's Memo transmitted the materials previously reviewed by department faculty and additionally included Plaintiff's personal statement, support letters, syllabi, and annual reports. After approval by Woodward, Nusbaum, and Melina Hale, Dean of the College, the materials were transmitted to the Provost and later placed in Plaintiff's Personnel File.

126.    The Committee's Memo included statements concerning Plaintiff's Summer Session

21

2024 academic-misconduct reporting, including the following:

> Protocol adherence: Mr. Vasudevan did not report the suspected cheating to the undergraduate office as required but instead conducted his own investigation, compromising the OCCS's process.
>
> Respect for student privacy: During his self-investigation, he contacted another student in a manner that disclosed the identity of those involved.
>
> This event has led to threats of lawsuits against both Mr. Vasudevan and the University. This was, in fact, the way that the Co-Directors discovered that the disciplinary case was ongoing.

127. The Committee's Memo appended a lengthy assessment by Noel, which Noel emailed Lima, which included false and misleading statements, half-truths and omissions, and was used as the basis for the statements in the previous Paragraph.

128. The Chair's Memo summarized and republished the Committee's statements after they had already been circulated to department faculty, and also included the inaccurate assertion that Plaintiff refused to meet with the Co-Directors regarding the classroom observation and instead "would meet the faculty committee members."

129. In summarizing the faculty deliberations, Shaikh wrote:

> Derek Neal emphasized that Mr. Vasudevan's performance in the lecture he observed was poor. He argued that Mr. Vasudevan's design of the lecture was excessively narrow, his delivery was poor, and his choice of examples was weak, particularly in an area that has a rich set of applications from which to draw. Eric Richert concurred and added that Mr. Vasudevan handled students' questions poorly and did not use class time effectively.

### Abuse of Authority Complaint Against Lima

130. On March 11, 2025, Lima resumed the grading matter related to Kalarical and Vaughn in a new email thread that omitted prior communications in which he had instructed Plaintiff

22

to delay grade submission. On March 12, 2025, Lima directed Plaintiff to submit specified grades for the two students to the University's Registrar and escalated the matter to Shaikh and Nusbaum, creating the appearance that Plaintiff had failed to act.

131.    Plaintiff objected that he was being "coerced to turn in grades [he did not] believe the student... has earned" and that compliance would undermine "the integrity of [his] course" and his "academic judgment." Those objections were not addressed.

132.    On March 12, 2025, under time pressure and administrative escalation, Plaintiff entered the grades as directed while noting that the grades did not reflect the course syllabus or Plaintiff's academic judgment.

133.    On July 19, 2025, Plaintiff complained to Gould, Nusbaum, and Shaikh about Lima's conduct and requested reassignment to a different supervisor while the complaint was pending.

134.    Gould repeatedly delayed investigation of the complaint by requesting additional materials, while Plaintiff remained under Lima's supervisory control.

135.    Further, Gould stated that the University had the right under the CBA to change an instructional professor's grade. Gould also stated that Gould had not yet reviewed Plaintiff's complaint and submitted materials.

136.    After it became clear that there would not be a meaningful investigation, Plaintiff withdrew the complaint.

### *Arbitration Hearing*

137.    After Plaintiff emailed the Provost seeking a Step 3 meeting, Nguyen told Plaintiff to cease further internal communications with the Provost's Office on the ground that such discussions were not "privileged." Carpenter separately told Plaintiff not to submit further internal complaints to the University after Plaintiff complained about Lima's abuse of authority.

138.    Plaintiff never received a Step 3 Answer on the second Union grievance, and Whitman

23

provided no explanation.

139. During arbitration-hearing preparation in July 2025, Nguyen and Payne discussed settlement with Plaintiff. Plaintiff expressed reservations about any clause that would "release all claims," and Payne stated that the University would insist on such a provision.

140. Plaintiff later informed Carpenter and Nguyen that although Plaintiff was prepared to sign a limited release, Plaintiff would not sign a "global release."

141. Plaintiff did not receive any communication regarding the University's response to the discussed settlement position and therefore presumed that the offer had been rejected.

142. With the hearing approaching, Carpenter informed Plaintiff on July 29, 2025 that Carpenter would not attend the arbitration hearing, stated that Plaintiff's grievances would likely be denied, urged Plaintiff to "settle on the one issue most important to you," and stated that once a decision issued the Union would treat the matter as "closed," with "no appeal or additional proceedings."

143. Around the same period, Whitman refused Plaintiff's request for copies of the filed grievances, stating that "[t]he Union does not provide internal documentation."

144. During preparation sessions on July 30 and 31, 2025, Nguyen and Payne handled witness and evidentiary preparation. Nguyen also stated that Carpenter and Wermuth had spoken by phone, that Wermuth had described Plaintiff as "irritating" for declining the University's buyout-and-resignation proposal, and that Carpenter and Wermuth were on "good terms."

145. A few days before the hearing, Wermuth raised procedural arbitrability arguments with the Union.

146. Soon after, Plaintiff raised concerns with Carpenter about Nguyen's preparation for the hearing. Carpenter assured him that Nguyen would be present and prepared.

147. On August 5, 2025, Plaintiff appeared before the Arbitrator with Nguyen, Payne, and Andrew Yale, Union Representative, for the Union, and Leibsker and Wermuth for the

University. Plaintiff understood that Wermuth raised procedural arbitrability again in an attorney-only meeting with the Arbitrator, that Nguyen and Payne were not prepared to argue the issue despite prior notice, and that Wermuth instead proposed settlement discussions.

148.  With no other alternative, Plaintiff agreed to participate in settlement discussions mediated by the Arbitrator on the condition that Lima not be present during the joint sessions. Nguyen accepted that condition.

149.  During the joint session, however, Wermuth stated that she was going to bring Lima and Yoshida into the meeting.

150.  Plaintiff reiterated to the Arbitrator the condition on which he had agreed to proceed.

151.  Nguyen silenced Plaintiff. Wermuth and Leibsker then stepped outside to fetch Lima and Yoshida but returned without them, stating that they were prepared to continue without their presence.

152.  The parties then made opening statements. During the University's opening, Plaintiff corrected a factual error, and Wermuth cut him off, stating, "I let you do your thing. We have a lot of objections to the facts."

153.  Plaintiff noted multiple additional misrepresentations by Wermuth, but neither Nguyen nor Payne corrected them.

154.  The Arbitrator then invited Plaintiff and the Union into caucus to discuss settlement, suggested returning to the last proposal discussed before the hearing, and discussed converting an additional terminal year into monetary value.

155.  Plaintiff calculated that value and presented it to the Arbitrator.

156.  After a caucus with the University, Wermuth returned with a proposal aimed at "finality," but with monetary compensation that was only a fraction of what the Union had demanded.

157.  In a later caucus, Plaintiff became visibly distressed and cried. The Arbitrator stated

25

that Plaintiff could take as much time as needed and added that caucus discussions were confidential from the University.

158.    During a subsequent caucus, Plaintiff discussed a possible concession and asked for permission, before any proposal was made to the University, to consult his personal attorney by phone.

159.    With the consent of the Arbitrator and the Union's attorneys, Plaintiff stepped out to do so.

160.    While Plaintiff was on the phone with his attorney, Wermuth entered the kitchenette area and remained there while filling a water bottle, causing Plaintiff to pause the conversation.

161.    Plaintiff's personal attorney advised against the discussed concession and suggested a different response. When Plaintiff returned to caucus, he stated that he would not proceed with the previously discussed offer. However, Payne had already disclosed that potential offer to the University without his consent.

162.    Plaintiff objected to the disclosure of the proposal outside of joint session.

163.    Payne responded to the Arbitrator, "Sorry to step into your shoes, but we are running out of time," and Nguyen added, "It is not a formal offer."

164.    Plaintiff then requested that his personal attorney be allowed to address the Arbitrator by phone.

165.    Payne rejected that request, stating, "The Union is going to say no to that."

166.    After that point, the caucus and joint-session structure effectively ceased. Payne conducted discussions outside of joint session, and Wermuth returned intermittently with sequential offers from the University.

167.    Eventually Wermuth presented an offer she described as final and lower than the monetary amount Plaintiff had stated was a redline.

168.    After Wermuth departed, Payne and Nguyen repeatedly pressed Plaintiff to accept the

26

proposal as the University's final offer. Emphasizing the time pressure, Nguyen exclaimed, "I have a life."

169. Under that pressure, Plaintiff agreed to the framework of the proposal (the "Term Sheet").

170. In joint session, after Plaintiff requested greater detail on certain provisions, Wermuth returned with a revised version in which the clause entitled "Mutual Confidentiality" appeared to be a copied screenshot from another agreement.

171. Plaintiff signed the document along with Leibsker, and Wermuth stated that any final agreement would also require the signature of Rob Hochman, General Counsel of the University.

172. On August 11 and August 20, 2025, Plaintiff followed up with Nguyen regarding receipt of a written settlement agreement.

173. On August 21, 2025, Nguyen sent Plaintiff an agreement that Nguyen had received on August 18 and stated that Plaintiff had until September 7 to review and sign it.

174. Plaintiff responded that the written agreement differed from the terms Plaintiff understood had been discussed during mediation.

175. On August 26, 2025, Nguyen asked Plaintiff to send the signed agreement by September 6 for Nguyen's review, further shortening Plaintiff's review period by four days.

176. On August 31, 2025, Plaintiff declined to settle and requested resumption of the arbitration proceedings that had been paused for the last-minute mediation effort.

177. That same day, Carpenter responded that the Union would withdraw Plaintiff's grievances unless Plaintiff accepted the settlement terms, writing, "If you do not intend to abide by the terms mutually agreed to at mediation, the Union will withdraw the grievances."

178. On September 2, 2025, Carpenter again stated that "arbitration is not yours to demand" and that "the Union will not be demanding that we proceed," while also accusing Plaintiff of having "denigrated Local 73" and "belittled" Nguyen.

27

179. After Plaintiff again sought copies of the grievances, Carpenter produced them on September 9, 2025.

180. On September 23, 2025, Carpenter stated in writing, "We haven't done anything with the grievances except forwarding your note to Arbitrator [redacted] at your request."

181. On September 26 and 29, 2025, Plaintiff filed NLRB charges against the University and the Union, respectively.

182. Plaintiff later confirmed that Payne was not licensed to practice law in Illinois at the time Payne acted as one of Plaintiff's legal representatives in connection with grievance, arbitration, mediation, and settlement-related matters.

183. On December 27, 2025, Plaintiff asked Carpenter to confirm whether Payne had been licensed to practice law in Illinois when Payne represented Plaintiff at the arbitration hearing. Plaintiff did not receive a response.

### *Medical Leave*

184. In September 2025, Plaintiff contacted Gould, the University's leave administrator for academic appointees, to discuss possible medical leave. Before any formal leave request or designation had been made, Gould informed Manick that Plaintiff would be taking medical leave. Manick relayed that information to Plaintiff while copying Shaikh and Lima, thereby disclosing Plaintiff's anticipated medical leave without Plaintiff's consent.

185. During discussions concerning FMLA leave, Gould informed Plaintiff that employees on FMLA leave would lose access to offices, libraries, professional development funds, research funds, and academic or professional activities, writing that "If you are well enough to participate in professional activities, we expect you to be at work." Plaintiff received inconsistent and confusing instructions regarding leave documentation, and although Gould stated that Plaintiff's leave had been approved, Plaintiff did not receive a formal FMLA designation notice.

186. During Plaintiff's leave, Manick informed departmental staff that Plaintiff was on

28

FMLA leave and could not work on research, after which Plaintiff instructed Manick not to disclose Plaintiff's medical status without permission. Manick then directed Plaintiff not to contact departmental grant administrators.

187. During and after Plaintiff's leave, the Department denied or reversed certain research-related expenses, removed Plaintiff from a year-long academic working group after consultation with University counsel, restricted Plaintiff from interviewing teaching assistants for upcoming courses until returning to work, and issued conflicting instructions regarding Plaintiff's non-teaching duties.

188. After Plaintiff returned from leave, Plaintiff sought clarification regarding remaining FMLA leave balance and applicable policies. University administrators were unable to provide a clear accounting or identify a responsible record keeper, and directed Plaintiff between offices without resolution. When Plaintiff later requested written policies supporting the asserted restrictions on research activities and expenses during FMLA leave, no such policies were produced.

### *Plaintiff's Personnel File and Notice to the Office of Legal Counsel ("OLC")*

189. On December 17, 2025, Plaintiff submitted a written request for Plaintiff's personnel file through the University's ServiceNow system. Plaintiff was informed in writing that the Provost's Office did not use ServiceNow for personnel-file requests.

190. After Plaintiff contacted the Provost's Office, Theodore Stamatakos, Senior Associate General Counsel in OLC, provided Plaintiff, in writing, a personnel-file folder through the Box service. The materials included an "mbox" file containing a curated set of email messages, from November 18, 2024 through May 12, 2025, concerning Plaintiff's progression review, Union grievances, Title IX complaint, and other related matters, involving senior administrators, including several Defendants, from across the University.

191. After receiving the materials, Plaintiff inquired with Stamatakos through what date the personnel file was complete. Stamatakos did not provide a responsive answer.

192. After reviewing the materials, and being alarmed by the content of the communications among senior administrators, especially those in Plaintiff's supervisory chain, Plaintiff requested that Stamatakos arrange an interim reassignment of supervisory control pending resolution of Plaintiff's concerns.

193. On December 30, 2025, Stamatakos declined in writing and directed Plaintiff back to the same University personnel and to the Union.

194. On the same day, Plaintiff emailed Paul Alivisatos, President of the University, reiterating the request for interim reassignment and stating that the personnel file contained "internal communications raising substantial concerns about conflicts, retaliation, and the integrity of supervisory decision-making affecting my role." Plaintiff further stated that Plaintiff had not received responses from Plaintiff's Co-Directors, Department Chair, Master, Dean, or the Provost despite directly raising these concerns.

195. Plaintiff did not receive a reply and remains subject to the same supervisory chain.

### Terminal-Year Contract

196. On May 12, 2025, Plaintiff received and signed his Terminal-Year Contract. The contract provided that Plaintiff would teach six courses during the 2025–2026 academic year—two courses in each quarter—and perform specified advising and administrative duties under the direction of departmental leadership.

197. On September 9, 2025, after Plaintiff rejected the University's settlement proposal in exchange for a release of claims, Leibsker stated that Plaintiff would hear from Lima or Shaikh confirming course assignments consistent with the May 2025 appointment letter and that no course releases would be provided because Plaintiff had declined the settlement.

198. That same day, Lima emailed Plaintiff an altered teaching assignment reducing the Fall Quarter teaching load by one course and adding an additional course in the Spring Quarter. The May 2025 contract provided for two sections per quarter and did not authorize unilateral modification of the teaching load.

30

199. After returning from medical leave, Plaintiff asked Leibsker to confirm that the contract teaching load remained unchanged. Leibsker, after consulting Lima, reiterated the altered assignment and directed Plaintiff to Lima for further questions. Lima further stated that non-teaching duties from the Fall Quarter would accrue during the Spring Quarter.

200. Plaintiff objected in writing to this unilateral modification of the contract and notified the contract signatories—Jackson, Nusbaum, and Woodward—of the violation.

201. On February 12, 2026, Manick sent Plaintiff an addendum purporting to modify the contract by assigning three sections of Econometrics in Spring Quarter 2026 and stating that "failure to acknowledge this addendum does not absolve you from your responsibility for the revised list of duties."

202. Plaintiff did not acknowledge the addendum and again objected when the University listed the additional course for student enrollment under Plaintiff's name. The course nevertheless remained listed for enrollment.

### Part C: Claims for Relief

### Count 1: Violation of Illinois Whistleblower Act

*Defendants*: The University of Chicago, Ingrid Gould, Peggy Harper, Min Sok Lee, Brett Leibsker, Victor Lima, Betsy Noel, Azeem Shaikh, Amanda Woodward, and Kotaro Yoshida. *Statutes*: 740 ILCS 174/15(c), 740 ILCS 174/20.

203. Plaintiff repeats and realleges Paragraphs 44–49, 52–57, 93–105, 130–136, and 189–195.

204. Plaintiff engaged in protected activity under 740 ILCS 174/20 by refusing to participate in conduct he reasonably believed violated a law, rule, or regulation.

205. Plaintiff also engaged in protected activity under 740 ILCS 174/15(c) by disclosing to supervisors and other University officials information related to activity, policy, or practice of the employer that Plaintiff reasonably believed violated laws, rules, or regulations.

206. At the time of this protected activity, Plaintiff reasonably and in good faith be-

lieved that the conduct at issue violated laws, rules, or regulations governing transparency, accountability, fairness in admissions review, integrity in academic decision-making, and the use of University facilities and alcohol-related conduct.

207.    After Plaintiff engaged in protected activity, Defendants took materially adverse actions affecting Plaintiff's employment, including unfair progression review, non-progression, and actions affecting Plaintiff's compensation, professional roles, work opportunities, and conditions of employment.

208.    The temporal sequence between Plaintiff's protected activity, Defendants' reactions to Plaintiff's objections and disclosures, Defendants' internal coordination concerning Plaintiff's reports, and the subsequent adverse actions supports a causal connection between Plaintiff's protected activity and Defendants' retaliatory conduct.

**Count 2: Defamation Per Se (Professional Competence)**

*Defendants*: Min Sok Lee, Victor Lima, Derek Neal, Betsy Noel, Eric Richert, Azeem Shaikh, and Kotaro Yoshida.

209.   Plaintiff repeats and realleges Paragraphs 59–80, 107–112, and 124–129.

210.    Defendants made and republished false statements of fact concerning Plaintiff that prejudiced Plaintiff in the discharge of his profession by imputing lack of professional competence, judgment, and fitness as an instructor and academic appointee. Defendants acted jointly and in concert in creating, adopting, transmitting, republishing, preserving, and relying upon those statements.

211.    Defendants made or republished these statements with knowledge of falsity or reckless disregard for truth. Plaintiff contemporaneously corrected the pedagogical and technical criticisms in the observation report.

212.    Because the statements imputed deficient professional competence, judgment, and fitness in Plaintiff's occupation, they constitute defamation per se under Illinois law, and damage to Plaintiff's professional reputation is presumed. Their circulation and preservation

32

within University decisionmaking channels contributed to adverse consequences affecting Plaintiff's standing and progression.

**Count 3: Defamation Per Se (Professional Integrity)**

*Defendants*: Bridget Collier, Ingrid Gould, Peggy Harper, Brett Leibsker, Azeem Shaikh, and Amanda Woodward.

213.  Plaintiff repeats and realleges Paragraphs 93–105.

214.   Defendants made and republished false statements of fact concerning Plaintiff that imputed dishonesty, bad faith, and lack of professional integrity in his testimony on March 10, 2025. Defendants acted jointly and in concert in forwarding, adopting, transmitting, republishing, preserving, and relying upon those statements in internal emails, formal outcome materials, and related institutional processes.

215.   Defendants made or republished these statements with knowledge of falsity or reckless disregard for truth. Plaintiff objected to Gould's characterization of Plaintiff's testimony, requested correction of the record, and then provided a transcript of the meeting while inviting correction if inaccurate. Defendants did not correct the characterization and instead allowed the challenged account and resulting disposition to stand.

216.   Because these statements falsely imputed dishonesty, bad faith, and lack of professional integrity in Plaintiff's occupation, they constitute defamation per se under Illinois law, and damage to Plaintiff's professional reputation is presumed. Their coordinated use and preservation within University processes and records contributed to compensable harm.

**Count 4: Tortious Interference with Prospective Economic Advantage (Fair Progression Review)**

*Defendants*: Peggy Harper, Jeff Jackson, Katie Kaftanich, Min Sok Lee, Brett Leibsker, Victor Lima, Sherry Manick, Derek Neal, Betsy Noel, Azeem Shaikh, Anna Wermuth, Amanda Woodward, and Kotaro Yoshida.

33

217.  Plaintiff repeats and realleges Paragraphs 89–92, 107–112, and 116–122.

218.  Plaintiff had a reasonable expectancy of progression-related economic advantage arising from continued participation in the University's academic-appointment system through a fair progression-review process. That expectancy was concrete and objectively reasonable because Plaintiff submitted review materials for inclusion in the progression record, remained entitled to procedural protections governing review, response, and grievance processes, and timely invoked those processes in an effort to protect Plaintiff's employment interests.

219.  Defendants knew of Plaintiff's reasonable expectancy of progression-related economic advantage and knew that manipulating, distorting, or obstructing the review and grievance processes would impair Plaintiff's opportunity to realize that expectancy. Defendants were directly involved in Plaintiff's review-material submission, reviewer-identity disclosure, review memoranda, grievance meetings, and non-progression determination.

220.  Defendants intentionally and without justification interfered with Plaintiff's expectancy through unfair process manipulation, defective grievance handling, reliance on incomplete or misleading review framing, and obstruction of corrective mechanisms on which Plaintiff's expectancy depended. Defendants acted jointly and in concert in forwarding the completed review despite the acknowledged procedural defects.

221.  As a direct and foreseeable result of Defendants' interference, Plaintiff's expectancy of progression-related economic advantage was disrupted and ultimately defeated. The sequence of delayed or incomplete reviewer disclosure, transmission of the completed review before meaningful response, failure to remedy procedural defects through the first grievance, non-progression, and obstruction of the second grievance supports a causal connection between Defendants' interference and the loss of Plaintiff's progression-related economic advantage.

222.  As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered economic and other compensable harms, including loss of continued employment progression, loss of associated compensation and professional opportunities, and related reputational and

34

career harm.

## Count 5: Breach of Collective Bargaining Agreement and Breach of Duty of Fair Representation

*Defendants*: The University of Chicago and SEIU Local 73. *Statutes*: 29 U.S.C. §185(a); 29 U.S.C. §159(a).

223. Plaintiff repeats and realleges Paragraphs 89–92, 116–122, and 137–183.

224. A valid collective bargaining agreement governed the terms and conditions of Plaintiff's employment, including procedures governing performance review, classroom observation, notice and response rights, and grievance and arbitration processes. Plaintiff invoked those contractual protections in connection with the classroom observation, the review process, the ensuing grievance proceedings, and the arbitration process.

225. The University breached the CBA by conducting Plaintiff's performance review and related grievance handling in violation of mandatory contractual protections, including the advance-notice and observer-identification requirements for classroom observation, disclosure of the progression review report, response opportunities, and grievance-processing obligations.

226. The Union breached its duty of fair representation by acting arbitrarily or in bad faith in its handling of Plaintiff's grievances and arbitration, including by filing the First Grievance with obvious errors, failing to correct known defects in the grievance presentation, obstructing or failing to pursue the grievance and arbitral processes needed to enforce Plaintiff's contractual rights, participating in coercive settlement pressure during the arbitration, threatening grievance withdrawal if Plaintiff declined settlement, refusing to resume arbitration after Plaintiff rejected settlement, and delaying or obstructing Plaintiff's access to grievance records and status information.

227. The Union's breach substantially contributed to and allowed the University's contractual violations to remain unremedied by depriving Plaintiff of fair and effective enforcement

35

of his contractual rights through the grievance and arbitration process. The sequence of the Union's perfunctory handling of the grievances, the coercive and irregular handling of the arbitration settlement process, and the Union's refusal to resume arbitration after Plaintiff declined settlement supports a causal connection between the Union's breach and the continuation of the University's contractual violations.

228. As a direct and proximate result of Defendants' breaches, Plaintiff suffered loss of contractual protections, loss of employment progression opportunities, reputational injury, and economic harm. Those harms were compounded by the Union's coercive settlement handling, refusal to resume arbitration, and failure to pursue effective contractual remedies after Plaintiff declined settlement.

## Count 6: Fraudulent Concealment (Unlicensed Legal Representative Status of Payne)

*Defendants*: Matthew Carpenter, Shayla Nguyen, and Wesley Payne.

229. Plaintiff repeats and realleges Paragraphs 137–183.

230. Defendants concealed and failed to disclose a material fact: that Payne was not licensed to practice law in Illinois while acting as one of Plaintiff's legal representatives in grievance, arbitration, mediation, and settlement-related matters. That fact was material because Payne provided legal advice to Plaintiff, participated as counsel in the arbitration hearing and caucus process, shaped Plaintiff's settlement posture, disclosed Plaintiff's caucus position to the University without Plaintiff's consent or agreement, rejected Plaintiff's request to allow Plaintiff's personal attorney to address the Arbitrator by phone, and participated in pressuring Plaintiff to accept the Term Sheet.

231. Defendants had a duty to disclose Payne's unlicensed status to Plaintiff because they presented Payne as a legal representative for the Union in matters requiring legal judgment, advocacy, and advice concerning Plaintiff's contractual rights, arbitration rights, settlement rights, and related employment interests. Carpenter and Nguyen also had a duty to disclose

that fact when assigning Payne to advise and represent Plaintiff in those matters.

232.    Defendants knew of Payne's unlicensed status and concealed it with the intent to induce Plaintiff to rely on Payne's participation and advice as if Payne were duly authorized to provide legal representation in Illinois. Defendants intended that Plaintiff accept Payne's role in preparing for the arbitration hearing, advising Plaintiff during caucus and settlement discussions, and influencing Plaintiff's decisions concerning concessions, disclosure of caucus positions, and acceptance of the Term Sheet.

233.    Plaintiff did not know that Payne was unlicensed in Illinois and justifiably relied on Defendants' concealment by accepting Payne's role as a legal representative, receiving Payne's legal advice and direction during hearing preparation and mediation, permitting Payne to participate in confidential caucus discussions, and proceeding through the arbitration and settlement process without objecting to Payne's authority to act in a representative legal capacity.

234.    As a direct and proximate result of Defendants' concealment, Plaintiff suffered economic and other compensable harm, including impairment of Plaintiff's ability to make informed decisions regarding arbitration and settlement, exposure to coercive settlement pressure guided in part by an undisclosed and unauthorized legal representative, loss of a fair opportunity to protect Plaintiff's contractual and employment-related interests through the arbitral process, and related professional and litigation-related harm.

**Count 7: Tortious Interference with Prospective Economic Advantage (Arbitration Resolution)**

*Defendants*: Shayla Nguyen, Wesley Payne, and Anna Wermuth.

235.  Plaintiff repeats and realleges Paragraphs 137–183.

236.    Plaintiff had a reasonable expectancy of economic advantage arising from participation in arbitration or mediation processes before the Arbitrator, including a fair opportunity to seek relief through those processes, to evaluate settlement on accurate and complete

37

information, and to realize the economic and professional benefits that could flow from a fair resolution. That expectancy was concrete and objectively reasonable because Plaintiff timely invoked and pursued those procedures to resolve employment-related claims.

237. Defendants knew of Plaintiff's expectancy of economic advantage in those processes and knew that concealment, misrepresentation, coercive settlement tactics, and interference with Plaintiff's access to accurate information would impair Plaintiff's ability to realize that expectancy.

238. Defendants intentionally and without justification interfered with Plaintiff's expectancy through improper means, including concealment of material facts, misleading partial disclosures, coercive settlement tactics, and procedural obstruction directed at the very processes on which Plaintiff's expectancy depended. Defendants acted jointly and in concert in coordinating caucus-based settlement positions, disclosing or acting on caucus positions without full consent, and pressuring Plaintiff into signing a Term Sheet under incomplete information.

239. As a direct and foreseeable result of Defendants' interference, Plaintiff's expectancy of a fair and meaningful arbitration or mediation resolution was defeated. The sequence of concealment, caucus pressure, unauthorized discussion of Plaintiff's confidential settlement position supports a causal connection between Defendants' interference and the loss of that expectancy.

240. As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered economic and other compensable harms, including loss of a fair opportunity to obtain relief through arbitration or mediation, loss of associated economic advantage, and related professional and litigation-related harm.

**Count 8: Violation of the Family and Medical Leave Act (Interference and Retaliation)**

*Defendants*: The University of Chicago, Bridget Collier, Ingrid Gould, Peggy Harper, Brett Leibsker, Victor Lima, Sherry Manick, Azeem Shaikh, and Scott Velasquez.

*Statutes*: 29 U.S.C. §2615(a)(1); 29 U.S.C. §2617(a).

241. Plaintiff repeats and realleges Paragraphs 184–188.

242. Plaintiff was entitled to take FMLA leave and engaged in protected activity under the FMLA by requesting and taking such leave and by asserting rights during the leave-administration process.

243. Defendants interfered with, restrained, or denied the exercise of Plaintiff's rights under the FMLA by imposing categorical restrictions during leave, providing contradictory and incomplete guidance regarding leave administration, failing to provide a formal FMLA Designation Notice, and refusing to identify or produce governing written policies for the restrictions and denials imposed during Plaintiff's leave.

244. Defendants further interfered with Plaintiff's FMLA rights by restricting Plaintiff's access to workspaces, funds, research-related activities, committee service, and course-preparation functions; by altering Plaintiff's duties in connection with leave and return to work; by disclosing Plaintiff's medical status without a legitimate need to know; and by restricting Plaintiff's communications with staff after Plaintiff objected to that disclosure.

245. Defendants also interfered with Plaintiff's FMLA rights by denying or reversing previously approved professional-development and research expenses during leave, treating them as personal expenses, deducting corresponding amounts from Plaintiff's pay, and applying inconsistent standards to similar expenses.

246. After Plaintiff engaged in protected activity, Defendants took materially adverse action affecting Plaintiff's employment, including actions affecting Plaintiff's compensation, professional roles, working conditions, and ability to perform ordinary academic and research

functions. Collier and Velasquez repeatedly denied Plaintiff's accommodation requests under the ADA, including basic ones such a provisions of important polices and instructions in writing.

247. Defendants' interference caused prejudice and tangible harm to Plaintiff. The adverse action occurred after Defendants became aware of Plaintiff's protected activity and was justified by reference to Plaintiff's leave status, Plaintiff's exercise of FMLA rights, or Plaintiff's objections raised during the leave process. The temporal proximity between Plaintiff's protected activity and Defendants' actions, together with Defendants' contemporaneous statements linking restrictions and decisions to Plaintiff's leave status, supports a causal connection between Plaintiff's protected activity and the adverse action.

248. Defendants' later statements that the same restrictions would apply to future FMLA leave, together with their failure to provide clear guidance or respond to requests for clarification, further restrained and discouraged Plaintiff's exercise of FMLA rights.

249. As a direct and proximate result of Defendants' violations of the FMLA, Plaintiff suffered economic harm, including lost compensation and denied reimbursements, as well as other tangible employment-related harm.

**Count 9: Tortious Interference with Contract (Terminal-Year Contract)**

*Defendants*: Jeff Jackson, Brett Leibsker, Victor Lima, Howard Nusbaum, Azeem Shaikh, and Amanda Woodward.

250. Plaintiff repeats and realleges Paragraphs 196–202.

251. Plaintiff had a valid written contract with the University governing Plaintiff's terminal-year appointment, including Plaintiff's teaching and non-teaching duties for the 2025–2026 academic year.

252. Defendants knew of that contract and its terms.

253. Defendants intentionally and without justification induced and caused the University to breach that contract by directing, approving, or enforcing a unilateral alteration of Plain-

tiff's teaching assignment, attempting to impose accrued non-teaching duties inconsistent with the contract, and issuing or causing the issuance of an addendum purporting to modify the May 12, 2025 Letter of Appointment without Plaintiff's agreement.

254.    As a result of Defendants' inducement and interference, the University treated the altered assignment as operative, sought to impose revised duties notwithstanding Plaintiff's written objection, and continued to publish the additional course for student enrollment under Plaintiff's name.

255.    As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered economic harm and other tangible employment-related harm.

**Count 10: Intentional Infliction of Emotional Distress (IIED)**

*Defendants*: Ingrid Gould, Sherry Manick, and Victor Lima.

256.  Plaintiff repeats and realleges Paragraphs 184–188 and 196–202.

257.    Defendants engaged in extreme and outrageous conduct toward Plaintiff during Plaintiff's medical leave and return-to-work period by exploiting Plaintiff's medical vulnerability and institutional dependence. That conduct included disclosing Plaintiff's medical status without a legitimate need to know, imposing categorical restrictions on Plaintiff's professional and academic activities during FMLA-designated leave, restricting Plaintiff's communications with staff after Plaintiff objected to the disclosure, denying or reversing previously approved expenses during leave, removing Plaintiff from academic roles, altering Plaintiff's duties, and later attempting to impose unilateral changes to Plaintiff's terminal-year contract and teaching obligations. In the aggregate, this conduct reflected repeated misuse of institutional authority against a medically vulnerable employee.

258.    Defendants knew, or at minimum recklessly disregarded, that this conduct created a high probability of causing severe emotional distress. Defendants knew that Plaintiff was on medical leave, was seeking clarification and protection of leave-related rights, and was objecting to unauthorized disclosure of medical information and restrictions affecting

41

ordinary professional functioning. Defendants also knew that imposing contradictory leave restrictions while altering Plaintiff's duties and contract terms would intensify the resulting distress.

259.     Defendants' conduct directly and proximately caused Plaintiff severe emotional distress. The sequence and accumulation of medical-privacy violations, leave-related restrictions, economic denials, removal from academic roles, altered duties, and unilateral contract changes caused distress beyond ordinary workplace upset, including distress affecting Plaintiff's daily functioning, professional life, financial security, and sense of personal and professional safety. The distress was serious, prolonged, and of a severity that no reasonable person should be expected to endure.

260.     As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff suffered compensable harm, including severe emotional distress and related economic and non-economic damages.

**Count 11: Negligent Retention**

*Defendant*: The University of Chicago.

261.  Plaintiff repeats and realleges Paragraphs 38–51, 39–41, 81–92, 93–105, 130–136, 184–188.

262.     At all relevant times, the University retained Gould, Lima, Manick, Neal, and Yoshida in positions of authority over Plaintiff, including positions involving supervision, evaluation, grievance-related handling, leave-related administration, and other employment-related decisionmaking affecting Plaintiff's academic duties, contract rights, and professional standing.

263.  Before the harms described in this Complaint occurred, the University knew or should have known that Gould, Lima, Manick, Neal, and Yoshida had particular unfitness for those positions so as to create a foreseeable danger of harm to Plaintiff and similarly situated employees. The University had notice through prior complaints, internal reports, documented

objections, protected disclosures, grievance proceedings, Title IX-related reporting, and other information in its possession reflecting abuse of authority, procedural unfairness, misuse of evaluative power, retaliatory or coercive conduct, disregard of contractual protections, and misuse of sensitive employment-related processes.

264.     Despite that notice, the University retained Gould, Lima, Manick, Neal, and Yoshida in their positions and continued to entrust them with authority over Plaintiff's review process, grievance process, leave-related administration, contract-related duties, and other employment-related matters.

265.     The particular unfitness of Gould, Lima, Manick, Neal, and Yoshida, and made the harms alleged in this Complaint foreseeable to the University, and the University's negligent retention of those individuals proximately caused Plaintiff's injury. After the University had notice of the relevant unfitness, those individuals continued to exercise authority over Plaintiff in ways that contributed to the procedural violations, coercive conduct, retaliatory or unfair treatment, contract-related interference, reputational injury, and other harms described in this Complaint.

266.     As a direct and proximate result of the University's negligent retention of Gould, Lima, Manick, Neal, and Yoshida, Plaintiff suffered economic harm, reputational harm, emotional distress, and other compensable injury.

**Part D: Relief and Jury Demand**

267.     Wherefore, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

 (a)     Enter judgment in favor of Plaintiff and against Defendants on the Counts proved at trial or otherwise established.

 (b)     Declare that Defendants' acts, omissions, policies, practices, and retaliatory or otherwise unlawful conduct described in this Complaint violated Plaintiff's rights under the governing statutes, common law, and contractual provisions at issue.

43

(c)   Award Plaintiff compensatory damages in an amount to be determined at trial, including damages for lost compensation, lost employment-related opportunities, denied reimbursements, reputational harm, emotional distress, and other economic and non-economic harm proximately caused by Defendants' conduct.

(d)   Award presumed damages where available as a matter of law, including on Plaintiff's defamation per se claims.

(e)   Award punitive damages against the individual Defendants, and against any Defendant for whom punitive damages are otherwise available, in an amount sufficient to punish and deter the conduct proved.

(f)   Award all remedies available under the Family and Medical Leave Act, including damages, equitable relief, interest, liquidated damages as permitted by law, and such further relief as the statute authorizes.

(g)   Award all remedies available under the Illinois Whistleblower Act, including injunctive relief, actual damages, and any other relief authorized by law.

(h)   Award all remedies available under Section 301 of the Labor Management Relations Act and the law governing the duty of fair representation, including such legal and equitable relief as may be appropriate to remedy the contractual and representational violations proved.

(i)   Award Plaintiff costs, expenses, prejudgment interest where permitted, post-judgment interest, and attorneys' fees to the extent authorized by statute or other applicable law.

(j)   Grant appropriate equitable and injunctive relief, including relief necessary to remedy ongoing effects of the challenged conduct and to prevent recurrence of similar unlawful conduct.

(k)   Order such corrective or restorative relief as is necessary to address adverse records, memorializations, or institutional uses of false, misleading, retaliatory, or procedurally tainted materials concerning Plaintiff.

(l)   Award such relief as is necessary to remedy the contract-related, grievance-related,

44

45

arbitration-related, review-related, and leave-related harms caused by Defendants' conduct.

(m)    Award such other and further relief as the Court deems just and proper.

268.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully,

/s/ Srinivasan Vasudevan

April 9, 2026

1649 East 50th Street, Unit 4A

Chicago, IL 60615

Email: srinivasan.vasudevan000@gmail.com

Phone: (773) 786-3785