## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Srinivasan Vasudevan, | ) | **Case Number:** 1:26-cv-00211 |
| *Plaintiff,* | ) | **Judge:** Matthew F. Kennelly |
| v. | ) | **Magistrate Judge:** M. David Weisman |
| The University of Chicago, et al., | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO UNIVERSITY DEFENDANTS' PARTIAL MOTION TO DISMISS AND AMENDED MOTION TO DISMISS, AND UNION DEFENDANT'S MOTION TO DISMISS

### A. Requested Relief on the Operative Complaint

Plaintiff respectfully asks the Court to deny Defendants' Motions to Dismiss.

Plaintiff also respectfully requests leave to file an amended complaint consolidating the claims in the operative Complaint with those in the Proposed Amended Complaint already before the Court, ECF No. 21-1, and the claims for which Plaintiff received right-to-sue notices issued by the EEOC on April 30, 2026 and the IDHR on May 18, 2026. Leave is also warranted because related adverse actions and factual developments have continued since the operative Complaint was filed on January 12, 2026.

### B. Legal Standard: Rule 8 Does Not Require Evidentiary Itemization

Rule 8 requires fair notice and plausibility, not evidentiary proof. A complaint need not contain detailed evidentiary allegations: the Supreme Court has held that "specific facts are not necessary" where the pleading gives fair notice of the claim and its grounds. (Erickson

1

v. Pardus, 551 U.S. 89, 93 (2007).) Twombly requires enough factual matter to make relief plausible, but it does not impose "heightened fact pleading of specifics." (Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).) Iqbal likewise confirms that Rule 8 does not require detailed factual allegations, but requires enough factual content to permit a reasonable inference that the defendant is liable. (Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).)

The Seventh Circuit's practical test for plausibility is whether the complaint gives enough detail to tell "a story that holds together", not whether Plaintiff has already proved that story. (Swanson v. Citibank, N.A., 614 F.3d 400, 404–05 (7th Cir. 2010).) A complaint also may not be dismissed for imperfect legal framing where it informs defendants of the factual basis for the lawsuit. (Johnson v. City of Shelby, Miss., 574 U.S. 10, 11–12 (2014).)

Because Plaintiff proceeds pro se, the Complaint must be liberally construed and held to less stringent standards than lawyer-drafted pleadings. (Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015); Luevano v. Wal-Mart Stores, Inc., 722 F.3d 1014, 1027–28 (7th Cir. 2013).) Rule 8 also directs that pleadings "must be construed so as to do justice." (Fed. R. Civ. P. 8(e).) That rule does not excuse a pleading failure, but it does require the Court to read the Complaint for the claims the facts support rather than for technical omissions or imperfect legal phrasing.

Plaintiff must balance Rule 8's plain-language command with the evolving case law interpreting plausibility. Plaintiff's Complaint does so. It gives fair notice, identifies the actors and challenged conduct, identifies or references the relevant documents, quotes relevant statements verbatim, and pleads a coherent factual story that holds together, while remaining short and plain, concise and direct.

The Motions repeatedly ask the Court to resolve disputed characterizations in Defendants' favor. That is not the Rule 12 inquiry. Plaintiff pleads nonperformance, false factual predicates, and punishment attached to protected leave. Defendants relabel those facts using

"magic words": reasonable discretion, non-actionable academic judgment, and routine administration. Yeftich rejected that mode of pleading when used by plaintiffs; the Court should likewise reject it when used by defendants to override well-pleaded factual allegations. (Yeftich v. Navistar, Inc., 722 F.3d 911, 916 (7th Cir. 2013).) At the pleading stage, the Court must accept Plaintiff's well-pleaded facts as true, not Defendants' labels, and draw reasonable inferences in Plaintiff's favor.

## C. Count I Plausibly Pleads a Bad-Faith Breach of the Duty of Fair Representation by the Union

The Union cannot defeat Count I by reciting "reasonable discretion" at a high level. A union's representative authority includes a "wide range of reasonableness," but that range is bounded by complete good faith and honesty of purpose. (Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953).) A union breaches the duty of fair representation when its conduct is arbitrary, discriminatory, or in bad faith. (Vaca v. Sipes, 386 U.S. 171, 190 (1967).)

The Seventh Circuit applies the same boundary: a union need not pursue every grievance exactly as the employee prefers, but it must make an honest, rational representational decision rather than abandon representation through unexplained inaction, hostility, or post-hoc labels. (Yeftich v. Navistar, Inc., 722 F.3d 911, 916 (7th Cir. 2013); Neal v. Newspaper Holdings, Inc., 349 F.3d 363, 369–70 (7th Cir. 2003).) Discretion must be exercised, not merely invoked.

The Seventh Circuit further recognizes that bad faith includes fraud, deceitful action, or dishonest conduct. (Bishop v. Air Line Pilots Ass'n, Int'l, 900 F.3d 388, 397 (7th Cir. 2018).) That rule fits the pleaded facts here: Plaintiff alleges concealment of grievance documents, concealment of unlicensed status of staff attorney, unsupported accusations used as settlement pressure, disclosure of confidential caucus positions, refusal to clarify grievance status, continued refusal to communicate the status of Plaintiff's grievances after Plaintiff

3

filed an NLRB charge, and post-hoc invocation of discretion after nonperformance. As of this filing, Plaintiff remains in the dark as to whether his grievances were withdrawn or settled, and if settled, on what terms. Vaca expressly preserves claims where a union arbitrarily ignores a meritorious grievance or processes it in a perfunctory manner, and Hines recognizes that deficient investigation and bad-faith grievance handling can cause the grievance process itself to malfunction. (Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563–71 (1976).)

The Union did not make reasoned representational decisions because it did not first attempt to understand the grievance. As late as three days before the scheduled arbitration, Nguyen had not started preparing for the arbitration hearing, had not correctly understood Plaintiff's non-tenure-track academic appointment, had not reviewed the governing CBA provisions, and had not identified witnesses. The Union also internally recognized that the assigned staff attorney was not prepared for arbitration, yet still sent that attorney forward to represent Plaintiff in a proceeding concerning his continued employment against a highly experienced counsel representing the University, Anneliese Wermuth. A union may choose among advocates and strategies, but it cannot knowingly assign an unprepared representative to a career-ending arbitration against the University's senior counsel and then call the resulting nonperformance "discretion."

The Union also concealed defects in the grievance process. Even assuming the repeated spelling errors and wrong grievant name did not themselves prejudice the grievances, Whitman's refusal to provide the grievances to Plaintiff on the ground that they were "internal documentation" supports bad-faith concealment. A union may argue that clerical errors were harmless; it may not hide the documents containing those errors from the member whose grievance rights it controls. Those errors also plausibly prejudiced Plaintiff's grievance position because they revealed lack of diligence to the University and could have affected the University's arbitration and settlement posture. Separately, the lack of a Step 3 answer to the second grievance prejudiced arbitration and settlement preparation by denying Plaintiff

and the Union the University's formal position, while the Step 3 Answer to the first grievance produced a concrete admission.

Steele reinforces why the Union's temporally inconsistent Step 3 handling supports bad faith. A bargaining representative must exercise its delegated authority "without hostile discrimination, fairly, impartially, and in good faith." (Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 203–04 (1944).) Plaintiff alleges that one grievance received a Step 3 answer while the related grievance did not, leaving Plaintiff without the University's formal position on the second grievance at the very moment the Union was predicting defeat and pressuring settlement. The Union offers no reasoned representational explanation for securing the contractual Step 3 process for one grievance while withholding or failing to secure that process for the related grievance before arbitration. In fact, the Union dissuaded Plaintiff from attempting to secure a Step 3 meeting himself, even though Step 3 was a bargained-for process under the CBA.

If the Union believed the grievances were weak, its conduct raises an obvious question: why did it take them to the edge of arbitration without preparing, developing witnesses, reviewing the CBA, or pursuing settlement earlier? The last-minute prediction of defeat does not show that the grievances lacked merit. It plausibly shows that the Union allowed the grievances to deteriorate through non-preparation and then recast its own lack of readiness as a merits assessment.

The Union did not make a reasoned settlement judgment. For months, despite Plaintiff's follow-ups, the Union did not actively pursue settlement, provide a status update, or explain any strategy. Then, only days before arbitration, it predicted defeat, revived settlement pressure. The Union shifted into mediation after arriving unprepared to argue procedural arbitrability. A union may choose settlement over arbitration, but discretion requires a timely, reasoned process. Months of silence followed by a last-minute prediction of defeat is not settlement strategy; it is evidence of dormancy, non-preparation, and pressure after

5

the Union let the grievance posture deteriorate. Settlement discretion does not begin at the arbitration hearing after months of unexplained dormancy and non-preparation.

The Union's bad faith is further supported by coercion and hostility. The Union did not merely urge Plaintiff to settle; it accused Plaintiff of serious misconduct, including "denigrating Local 73" and "belittling [Staff Attorney] Nguyen," while refusing to identify the factual basis for those accusations. Unsupported accusations are not settlement advice. The Union also escalated hostility after Plaintiff raised concerns that Nguyen's email account had been hacked and that confidential grievance-related information may have been exposed, including settlement materials, personnel-file information, and evidence. A union does not act in good faith when it treats a member's confidentiality concern as disloyalty. Finally, the Union transmitted the University's written settlement offer to Plaintiff for signature without reviewing it for consistency with the Term Sheet or even for basic typographical errors.

The Union also compromised Plaintiff's trust in the representational process itself. Nguyen made boundary-crossing and coercive statements, including asking whether Plaintiff was autistic, volunteering personal diagnostic speculation, stating that Carpenter was autistic, discussing Carpenter's criticism of her preparation, stating that she hated working for him, and telling Plaintiff that Wermuth stated that Plaintiff was irritating and was damaging the Union's relationship with the University. Those statements plausibly show that the Union's handling of Plaintiff's grievances was shaped by internal dysfunction and employer-facing relationship concerns rather than Plaintiff's representational interests.

The Union's conduct during the arbitration-related proceeding further supports bad faith and nonperformance. The Union did not disclose that Staff Attorney Wesley Payne was not licensed to practice law. During the hearing, Nguyen repeatedly interrupted Plaintiff and attempted to silence him while he was answering direct questions posed by the Arbitrator. The Union's attorneys failed to challenge University counsel's misrepresentations, failed to defend even their own factual assertions, and made material errors that required Plaintiff,

6

rather than the Union's attorneys, to answer CBA-related questions. Payne then obstructed Plaintiff's personal attorney from addressing the Arbitrator after the Arbitrator invited efficient clarification.

During mediation, after the Arbitrator had guaranteed caucus confidentiality and while Plaintiff was outside the caucus room consulting his personal attorney with permission, Payne and Nguyen held discussions with Wermuth about Plaintiff's internal settlement deliberations outside the Arbitrator's presence and before Plaintiff had authorized any offer.

The Union may have discretion to settle or withdraw grievances within its representational authority. But that discretion does not include coercing Plaintiff to personally release the University from all claims or to accept terms detrimental to Plaintiff that exceeded the grievance itself. The Term Sheet was not signed by the Union, and the settlement offer required Plaintiff's personal signature, not merely Union assent. The Union was therefore not simply resolving its own grievance-processing decision; it was pressuring Plaintiff to surrender personal legal rights. That plausibly alleges bad faith, not protected settlement discretion.

### D. Count II Plausibly Pleads Defamation Per Se With Actual Malice

The Supreme Court has recognized deference to genuine academic judgment exercised in good faith, but that deference presupposes professional judgment actually exercised and does not permit dismissal where Plaintiff pleads objective factual falsity, failure to follow specific procedures, or substantial departure from accepted academic norms. (Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985); Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 90–91 (1978).)

Plaintiff challenges false factual predicates, not genuine academic judgment. Plaintiff pleads discrete progression-review publications that accused him of deficient professional competence, judgment, and fitness as an instructor and academic appointee. He identifies two

review memoranda, alleges that they contain verifiable false factual assertions, alleges that they were published within the progression-review process, relied on by faculty and senior administrators, preserved in Plaintiff's personnel file, and later used or republished in grievance, arbitration, and mediation proceedings.

Plaintiff does not ask the Court to decide whether his teaching was excellent, mediocre, or poor. Plaintiff challenges professional-context factual assertions capable of being tested against the record. False factual predicates do not become academic judgment because they are stapled to a review memo. To put it bluntly, academic judgment cannot shield well-pleaded defamatory factual allegations at Rule 12. Defendants cannot obtain dismissal by invoking academic judgment without addressing the challenged publications.

Because Defendants argue that Count II does not identify specific false statements, Plaintiff attaches the challenged Committee Memorandum from Lee, Lima, Neal, Richert, and Yoshida to Shaikh as Exhibit A, and the challenged Chair Memorandum from Shaikh to Woodward and Hale as Exhibit B. Paragraph 42 of the operative Complaint already quotes representative false statements from Exhibit A, and Paragraph 43 quotes a representative false statement from Exhibit B. For the Court's convenience, those statements are restated below.

> 42    The Committee's Memo included statements concerning Plaintiff's reporting of academic misconduct in Plaintiff's course during the University's 2024 Summer Session, including statements about Plaintiff's interactions with the Office of College Community Standards (OCCS), and included the following assertions:
>
> "Protocol adherence: Mr. Vasudevan did not report the suspected cheating to the undergraduate office as required but instead conducted his own investigation, compromising the OCCS's process.";
>
> "Respect for student privacy: During his self-investigation, he contacted another

8

student in a manner that disclosed the identity of those involved.";

and "This event has led to threats of lawsuits against both Mr. Vasudevan and the University. This was, in fact, the way that the Co-Directors discovered that the disciplinary case was ongoing."

43    The Chair's Memo summarized the statements contained in the Committee's Memo after those statements had already been circulated to department faculty, and included the assertion that Plaintiff refused to meet with the Co-Directors to discuss the classroom observation and stated that Plaintiff "would meet the faculty committee members instead."

Defendants do not avoid defamation liability by labeling the challenged memoranda opinion, evaluative, or rhetorical. A statement or set of statements framed as opinion remains actionable if it implies or rests on objectively verifiable false facts, and verifiable factual assertions do not become nonactionable merely because they appear in evaluative form. Plaintiff alleges that the memoranda included concrete assertions about what occurred, what Plaintiff did or did not do, what academic-misconduct protocol required, how Plaintiff handled student matters, and what those facts showed about his professional competence. Those are factual assertions or factual predicates embedded in evaluative documents, not abstract educational preferences. (Milkovich v. Lorain Journal Co., 497 U.S. 1, 18–21 (1990); Law Offices of David Freydin, P.C. v. Chamara, 24 F.4th 1122, 1129–30 (7th Cir. 2022).)

Defendants also cannot obtain dismissal through the innocent-construction rule. Illinois courts read challenged statements in context and give them their natural and obvious meaning; they do not strain to invent an innocent reading detached from the publication's setting. (Tuite v. Corbitt, 224 Ill. 2d 490, 502 (2006); Ludlow v. Northwestern University, 79 F. Supp. 3d 824 (N.D. Ill. 2015).) Here, the challenged statements appeared in formal progression-review memoranda, were used to deny Plaintiff advancement, and concerned Plaintiff's professional competence, preparation, judgment, and fitness as an instructor and

9

academic appointee. In that context, the natural reading is not innocent criticism; it is a damaging professional-competence judgment grounded in allegedly false factual predicates.

Illinois recognizes a conditional privilege for certain employment or common-interest communications, but the privilege may be abused by knowing or reckless falsehood, improper purpose, or publication beyond what the occasion reasonably requires. At Rule 12, Plaintiff need only plausibly allege abuse, not disprove privilege before discovery. (Kuwik v. Starmark Star Mktg. & Admin., Inc., 156 Ill. 2d 16, 30–31 (1993); Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 692–93 (1989); Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 698–99 (7th Cir. 2006).)

Plaintiff does so: he alleges that Defendants published false factual assertions, ignored or avoided contrary record evidence and Plaintiff's corrections, acted from nonacademic and retaliatory motives, concealed the challenged review memoranda despite repeated requests and CBA procedures, and continued to rely on them in the progression process. Plaintiff obtained the memoranda only months after the non-progression decision, through the Union, after filing a second grievance concerning the CBA breach. Those allegations support a reasonable inference that Defendants knew, or at least seriously doubted, the accuracy and procedural legitimacy of the memoranda's factual predicates, and plausibly plead actual malice and abuse of qualified privilege.

**E. Count III Plausibly Pleads FMLA Interference and Retaliation**

The FMLA protects more than formal approval of leave; it protects the exercise of leave rights and the conditions tied to leave. It prohibits an employer from interfering with, restraining, or denying the exercise of FMLA rights, including by discouraging leave or using leave as a negative factor in employment actions. Plaintiff therefore need not plead that the University used the word "denied." Plaintiff pleads that Defendants burdened the exercise of leave, altered the conditions attached to leave and return, and controlled his leave conditions

through communications, employment actions, and leave processing. That is enough at Rule 8 and Rule 12. (29 U.S.C. §2615(a)(1); 29 C.F.R. §825.220(b), (c); Ziccarelli v. Dart, 35 F.4th 1079, 1088–89 (7th Cir. 2022).)

Plaintiff does not allege merely that he was unhappy with being on leave. He alleges that Defendants used his protected leave status to impose overbroad and unpublished restrictions, disclose medical information without proper need, deny or reverse work-related expenses, restrict professional and academic access, and remove him from voluntary roles. Defendants then refused to identify the policies supposedly authorizing those restrictions.

Plaintiff also alleges a confusing leave-administration process, with no required notices, no clear accrual information, and no leave-category designation or balance information despite repeated requests. Plaintiff also alleges that Defendants effectively shortened his leave by one day by requiring him, at the last minute, to move out of his office during the proposed leave period while he was experiencing acute symptoms of his medical condition.

The cumulative effect was not "routine administration"; it was a set of leave-status burdens that worsened Plaintiff's medical condition and deprived him of the restorative benefit FMLA leave is designed to protect. The same facts also plausibly plead retaliation because Defendants allegedly attached adverse employment consequences to Plaintiff's protected leave.

FMLA leave also carries restoration protections. An employee returning from FMLA leave must be restored to the same or an equivalent position, including equivalent benefits, working conditions, privileges, status, duties, responsibilities, and authority. Plaintiff alleges that Defendants altered or restricted work resources, professional-development access, research-related functions, committee participation, staff communication, course-preparation functions, and return-to-work conditions, including by unilaterally increasing Plaintiff's teaching load, removing him from professional non-teaching duties, and treating effort excused during leave as pending work to be performed after return.

11

Taken together, those allegations plausibly plead interference with protected leave and restoration rights. (29 U.S.C. §2614(a)(1); 29 C.F.R. §§825.214(a), 825.215(a).)

Approval of leave is not permission to punish Plaintiff by arbitrarily altering the conditions of leave through individualized application of unpublished policies. Defendants may not convert leave into a categorical bar on ordinary professional access while applying inconsistent standards in practice.

Defendants' own progression-review process undermines their categorical theory: Neal disclosed that he was on leave during the academic year in which Plaintiff was reviewed, yet Shaikh and Yoshida still insisted on and accepted Neal's service on Plaintiff's review committee. Leave status was not treated as categorically incompatible with professional or committee service when doing so served Defendants' interests. Additional comparator information suggests that work expenses are routinely processed and approved during leave, office access is routinely granted during leave, administrative support for professional access is routinely provided during leave, and campus access is routinely preserved during leave. These comparator allegations make Defendants' categorical leave-status theory a factual dispute, not a basis for dismissal.

Plaintiff pleads that Defendants exercised control over the conditions of his protected leave through employment actions during and after leave. Defendants are senior University administrators who communicated, processed, imposed, or enforced the challenged leave conditions. If Defendants contend they did not control those leave conditions, they must identify who did; that is a factual issue, not a Rule 12 basis for dismissal. At this stage, Plaintiff's well-pleaded allegations must be accepted as true.

**F. Conclusion**

Plaintiff pleads nonpreparation, nonperformance, concealment, Union hostility, and collusion between the University and the Union. The Union treats representational nonperformance

and interference with Plaintiff's internal employee rights as discretion. But discretion must be exercised in good faith, not merely invoked ex post in a lawsuit.

Plaintiff pleads false factual predicates used in a high-stakes performance review. Defendants cannot merely invoke academic judgment as a shield; they must identify how academic judgment was actually exercised as to the challenged factual allegations.

Plaintiff pleads overbroad unpublished restrictions, confusing approval, opaque and inconsistent leave administration, and prejudice attached to protected leave. University Defendants relabel those facts as routine administration. Routine administration should leave a routine paper trail. If the leave restrictions were truly routine, Defendants should be able to identify the written policy authorizing them. Their ex post invocation of "routine administration" is inconsistent with the absence of any pertinent written University policy.

Rule 12 does not permit dismissal on these bases. Plaintiff respectfully reiterates his request that the Court deny Defendants' Motions and grant leave to file an amended complaint.


Respectfully,

/s/ Srinivasan Vasudevan

May 27, 2026

1649 East 50th Street, Unit 4A

Chicago, IL 60615

Email: srinivasan.vasudevan000@gmail.com

Phone: (773) 786-3785

13