## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Srinivasan Vasudevan, | ) | **Case Number:** 1:26-cv-211 |
| *Plaintiff*, | ) | **Judge:** Matthew F. Kennelly |
| | ) | **Magistrate Judge:** M. David Weisman |
| v. | ) | |
| | ) | |
| The University of Chicago, Local 73 of the | ) | |
| Service Employees International Union, | ) | |
| Bridget Collier, Ingrid Gould, Margaret | ) | |
| Harper, Katherine Kaftanich, Min Sok Lee, | ) | |
| Brett Leibsker, Victor Lima, Sherry Manick, | ) | |
| Derek Neal, Elizabeth Noel, Eric Richert, | ) | |
| Marquetta Scott, Azeem Shaikh, Scott | ) | |
| Velasquez, Amanda Woodward, and Kotaro | ) | |
| Yoshida, *Defendants*. | ) | |

**Part A: Nature of the Case**

¶1.   Since September 1, 2019, Plaintiff has been employed by the University of Chicago as an Assistant Instructional Professor in the Kenneth C. Griffin Department of Economics. He has lifelong psychiatric conditions, and dysgraphia, which makes sustained handwriting disabling.

¶2.   When Plaintiff taught with slides rather than board work, his student course evaluations improved and his supervisors commended the results. The same supervisors nonetheless maintained a board-work expectation that they enforced against him and later disavowed.

¶3.   Plaintiff also engaged in protected activity: he refused directives to alter admissions recommendations and grades that he reasonably believed unlawful, reported the suppression of required academic-misconduct reporting, reported a supervisor-hosted, alcohol-centered gathering culture that excluded non-drinkers, and requested reasonable accommodations for his disabilities.

¶4.   In response, the University predetermined the outcome of his progression review. It engineered the review committee and the review record, circulated to the voting faculty a packet stripped of every favorable material assessment it already possessed, and placed in his record statements it knew to be false.

¶5.   When Plaintiff invoked the grievance machinery, the University admitted a process violation

1

while denying that any remedy existed, and his Union — after preparing the case for arbitration — abandoned the arbitration, breached mediation confidentiality, and coerced a settlement materially different from the term sheet signed during the mediation.

¶ 6. During the terminal year that followed, the University denied inexpensive accommodations, left medical leave as the only alternative, policed that leave with restrictions no written policy supported, disclosed his confidential medical information, and unilaterally altered his employment contract while he was on leave — precipitating a second psychiatric relapse.

¶ 7. When his personnel file revealed the state of his record, Plaintiff gave each responsible official written notice. Nothing was corrected.

¶ 8. This conduct constitutes disability discrimination, failure to accommodate, and retaliation under the ADA and the Illinois Human Rights Act, including by the individual defendants who acted after notice; interference and retaliation under the FMLA; retaliation for protected opposition under CRA/Title VII; a breach of the collective bargaining agreement and of the duty of fair representation under LMRA § 301; retaliation under the Illinois Whistleblower Act; defamation per se; and breach of Plaintiff's terminal-year employment contract.

**Part B:  Jurisdiction and Venue**

¶ 9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, including the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Labor Management Relations Act, 29 U.S.C. § 185.

¶ 10. This Court has supplemental jurisdiction over Plaintiff's state-law claims (under the Illinois Human Rights Act, the Illinois Whistleblower Act, and Illinois Common Law) pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

¶ 11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**Part C:  Parties**

¶ 12.  Plaintiff is an individual employed by the University of Chicago ("UChicago" or "University") as an Other Academic Appointee ("OAA") since September 1, 2019, holding the title of Assistant Instructional Professor ("AIP"), in the Instructional Professor (IP) Track, distinct from the Tenure Track, in the Kenneth C. Griffin Department of Economics ("Department") and the College.  Ex. 3-C, 11-B

¶ 13.  Plaintiff is a citizen of India lawfully present and employed in the United States under an H-1B visa, sponsored by the University.

¶ 14.  Plaintiff is a member of the bargaining unit known as UChicago Faculty Forward ("Bargaining Unit"), for which Local 73 of the Service Employees International Union ("SEIU Local 73" or "Local 73" or "Union") is the exclusive bargaining representative.  The University and Local 73 are named as Defendants.

¶ 15.  The Department Defendants are Azeem Shaikh, Chair of the Department since July 1, 2024 (succeeding Robert Shimer); Victor Lima, Senior Instructional Professor ("SIP"); Kotaro Yoshida, Associate SIP; Min Sok Lee, Associate SIP; Derek Neal, Professor of Economics; Eric Richert, Assistant Professor in Economics; and Sherry Manick, Director of Finance, Operations, and Personnel in the Department.

¶ 16.  At all relevant times Defendants Shaikh (and, before him, Shimer), Lee, Lima, and Yoshida exercised direct supervisory authority over Plaintiff.  Lee, Lima, Neal, Richert, and Yoshida, conducted Plaintiff's performance review for progression from Assistant Instructional Professor to Associate Instructional Professor ("progression review"), conducted his classroom observation, and co-authored its report (the "Observation Report") and his performance-review memorandum and non-progression recommendation (the "Committee's Memo").  Defendant Manick exercised administrative authority over Plaintiff's employment and personnel matters.

¶ 17.  The Defendants from the Social Sciences Division ("SSD" or "Division"), which houses the Department are Amanda Woodward, Dean of the SSD; Katherine (Katie) Kaftanich (formerly Casey), Assistant Dean in SSD until about March 2025; and Margaret (Peggy) Harper, Associate Dean in

SSD since about March 2025.

¶ 18. Defendant Woodward, along with Howard Nusbaum, Master of the Social Sciences Collegiate Division, and Melina Hale, Dean of the College, exercised the next level of supervisory and evaluative authority over Plaintiff. They received Shaikh's non-progression recommendation memorandum (the "Chair's Memo") along with the rest of his review materials. Defendants Kaftanich and Harper exercised administrative authority in employment and personnel matters.

¶ 19. Elizabeth (Betsy) Noel, Director of the Office of College Community Standards ("OCCS") in the College, Defendant, received and handled Plaintiff's reports of student academic and behavioral misconduct.

¶ 20. The Defendants from the Provost's Office and Human Resources ("Central Administration") are Ingrid Gould, Senior Associate Provost and the University official personally responsible for its disability-accommodation compliance since 1995, who administered its 2006 settlement with the United States resolving a federal ADA compliance review (Ex. 24); Bridget Collier, Associate Provost for Equal Opportunity Programs ("EOP"), Title IX Coordinator, Affirmative Action Officer, and Section 504/ADA Coordinator; Scott Velasquez, Executive Director of the Office for Equal Opportunity & Access and Deputy Title IX Coordinator; Marquetta Scott, Director of Access UChicago Now ("AUN") in EOP; and Brett Leibsker, Assistant Vice President of Human Resources.

¶ 21. Katherine Baicker, Provost, and Jeff Jackson, Assistant Provost, as Provost's Designee, exercised ultimate authority over Plaintiff's progression review, appointment, and contract. They received the recommendation memorandum from Woodward, Hale, and Nusbaum (the Deans' and the Master's Memo). Defendants Gould and Leibsker exercised administrative authority over Plaintiff in employment and personnel matters. Defendants Collier, Scott, and Velasquez received and handled Plaintiff's accommodation requests under the ADA. Additionally, Collier, along with other Defendants from the Department/Division/Central Administration and non-party University officials

4

received and handled Plaintiff's reports of discriminatory workplace practices.

**Part D: Chronology of Facts**

*The evidence accompanying this Complaint is organized into 24 Exhibits, each continuously paginated, with lettered evidence items. The citations are abbreviated as **Ex. 9-B**, indicating Exhibit 9, Item B. A citation of the form **Ex. 9-i4**, indicates Row 4 of the Exhibit's front Index of Evidence Items, which states each item's description and the fact it establishes. Documents produced by the University in discovery additionally bear their original production stamp, e.g., UC-Vasudevan_000371.*

***Board-Work Requirements Imposed on a Handwriting-Disabled Instructor***

¶ 22.  At the beginning of his AIP appointment, Lima and Yoshida emphasized the expectation of "chalk-and-talk" instruction.  Plaintiff followed it through Fall 2019 and Winter 2020, struggling: students complained about the legibility of his handwriting and the pace of instruction, slowed by writing on the board.

¶ 23.  Plaintiff has had longstanding handwriting difficulty since childhood: slow, effortful writing that tore the page and blistered his finger, disabling on timed examinations.  A diagnosis in his first Ph.D. year explained it as functional and persistent; his instructors granted a typing accommodation and his grades improved.

¶ 24.  During Winter Quarter 2020, amid pressure to perform board work, Plaintiff suffered severe disability-related stress and an acute episode of his psychiatric condition; the prescribed medications worsened his handwriting — tremors, muscle rigidity, slowed fine motor control — and his course evaluations fell far below Fall 2019's.

¶ 25.  Yoshida was contemporaneously aware of the distress: he called Plaintiff's behavior in a meeting "eccentric," and the June 2021 committee memorandum he co-authored acknowledged Plaintiff "was under a lot of stress when the incident took place."

¶ 26.  During that Quarter, Plaintiff emailed Collier requesting a meeting to discuss functional limitations and possible accommodations, and disclosed his three (3) long-standing psychiatric diagnoses. He received no accommodation response. Ex. 1-A

¶ 27.  In Spring 2020's pandemic transition to Zoom instruction, Plaintiff taught his existing courses by handwriting on an iPad — an improvement over the blackboard, still challenging; for a new course

he designed that quarter, he used slides — the mode he preferred, with improved performance and pace, and easier for students to follow.

¶ 28.   At the start of the fully remote 2020–21 year, Plaintiff asked Lima what device he used over Zoom, writing, "My handwriting on iPad isn't great!" Lima recommended a document camera — handwriting on paper, inferior to the iPad — and Plaintiff continued with the iPad.

¶ 29.   In Fall 2020, Lee, Lima, and Yoshida observed Plaintiff's Zoom lecture for his first review. Yoshida's roughly three-page Observation Report was generally positive but noted he "writes down almost everything that he says," a "habit [that] slows down the pace of the class significantly," and suggested writing faster.

¶ 30.     At the debrief, Lima and Yoshida appeared pleased — they appreciated his enthusiasm and student engagement — and Lee said Plaintiff was performing well in his Master's-program administrative and advising responsibilities.

¶ 31.   Over the break before the start of Winter Quarter 2021, after the Dean's Office raised concerns about Plaintiff's student course evaluations in Winter Quarter 2020 (¶ 24), the University placed Plaintiff on a performance improvement plan ("PIP") on December 15, 2020.  Plaintiff received the closure report on June 16, 2021.  Ex. 1-B

¶ 32.   Plaintiff continued using slides through Winter and Spring 2021 with improved evaluations. On April 6, 2021, he reported his winter means (4.47 and 5.00) to Lima and Yoshida; Yoshida replied, "These evaluations look great!  Please submit your write-up . . .  so that we can proceed to resolve your PIP."

***Disability Concerns Unaddressed Through Every Channel, a Disclosure Met with Laughter***

¶ 33.   When Lee questioned Plaintiff's two work-from-home days, Plaintiff replied that home helped him perform better and asked the expectation "be formally communicated to all AIPs and uniformly enforced." Lima recommended the library instead.

¶ 34.   Lima asked Plaintiff to come see him.  Lima and Yoshida met with Plaintiff, reprimanded him with a warning that it would be noted in his upcoming review, stated he should have sought permission, and declined to issue any general announcement.

¶ 35.   Plaintiff emailed Velasquez (EOP) requesting a disability-related accommodation and asking

6

what would be disclosed to his supervisors during the interactive process, stating a "strong preference that the nature of [his] disability not be disclosed" to supervisors or colleagues.

¶ 36. Plaintiff met with Marquetta Scott over Zoom on October 3, 2022. He raised the work-culture burdens and disclosed his functional limitations focusing on course preparation amid the office's distractions and interruptions. The next day, he raised the burdens in writing, describing "systemic issues (related to work culture)" that placed "a disproportionate burden on [him] due to . . . [his] disabilities." Ex. 1-C

¶ 37. Scott required medical documentation to proceed with an interactive process involving his supervisors, without clarifying how his medical information would be secured from them — a caution grounded in December 2020, when the Department referring to another instructor's performance improvement plan ("PIP") "as a sample" in an email quoted to Plaintiff. Ex. 1-B

¶ 38. Subsequent to the meeting, Plaintiff told Scott he would "go slow" citing the risk of an "(inadvertent) breach of confidentiality" of his medical information.

¶ 39. In Fall Quarter 2022, Lee, Lima, and Yoshida observed Plaintiff's in-person lecture for his second reappointment review, in the same course they would observe for his progression review in Fall Quarter 2024. Plaintiff taught using slides, with limited board use to address spontaneous student questions.

¶ 40. Yoshida's October 23, 2022 Observation Report faulted the lecture for using slides: "the principal mode of instruction is the board and any departure to slides should be carefully thought out." The debrief reiterated it. Ex. 3-E, 3-i5 Compare ¶ 29.

¶ 41. Plaintiff explained he had shifted to slides because students complained about his handwriting's legibility and pace. When pressed further, Plaintiff disclosed functional limitations relating to handwriting and managing multiple movable blackboards. Lee, Lima, and Yoshida responded to those concerns with laughter.

¶ 42. The Committee's Memo of that review — which Plaintiff received only through his personnel file in December 2025, ¶ 223 — repeated the board orthodoxy, insisting "slides and blackboard are complements, not substitutes" and that the reviewers "have made this point clearly in the past." Ex. 3-D, 3-i4

¶ 43.   The reviewers' "Memorandum" to Plaintiff, under the subject line "Performance Debrief - 2023" shared with him in April 2023, reiterated the board-work theme; the review nonetheless concluded with reappointment through August 31, 2025 — the same criticisms the 2024–25 review would recycle as grounds for non-progression. Ex. 3-A, 3-C

***Refusal to Alter Admissions Decisions, Then Discipline and Coercion***

¶ 44.   Contemporaneously with Plaintiff's second review (¶ 39), at a January 4, 2023 admissions-review staff meeting, Lee and Lima directed Master's-program reviewers to use only "stock phrases" in submitted comments, discouraged the previously required spreadsheets, warning that those were "subpoenable" and rejected a suggestion to seek guidance from University counsel on the changed process.

¶ 45.   Plaintiff understood the change as connected to the then-pending *Students for Fair Admissions* litigation and believed the directed alterations could require participation in an unlawful or improper admissions practice — circumventing judicial scrutiny of Title VI compliance, and contrary to the University's own standards of fair, individualized, nondiscriminatory review.

¶ 46.   Plaintiff refused to follow those instructions and continued to use the spreadsheets and provide individualized comments as before. Ex. 2-B

¶ 47.   On January 27, 2023, Plaintiff and his co-reviewer reported discrepancies in their admissions recommendations, as the communicated admissions-review process required.

¶ 48.   Lee and Lima directed Plaintiff to alter his decisions on two applicants, saying their transcripts should be discounted as from particular public universities; Plaintiff objected that this was inconsistent with fair admissions review.

¶ 49.   Despite that objection, Emma Rubinstein, MAPSS-Econ and MACSS-Econ Student Affairs Administrator, directed Plaintiff on February 2, 2023 to enter the altered decisions by the next morning; fearing further discipline, he complied.

¶ 50.   The following Quarter, a student confessed to cheating on one of Plaintiff's weekly quizzes, after initially denying it.

¶ 51.   Lima and Yoshida said Plaintiff had "created the conditions" for the cheating and discouraged him from reporting it to the Dean of Students as policy required; Yoshida then collected his exams

8

and grade distribution. Ex. 2-C

¶52. Plaintiff reasonably believed the discouragement was meant to avoid triggering a formal investigation and possible discipline of the student.

¶53. Lima and Yoshida directed Plaintiff to discontinue his quizzes and, in another course, class-wide memory aids and shared past exams — anxiety-reducing practices — to set uniform expectations. He complied under objection; Yoshida then demanded extensive grading data for audit.

***Grades Coerced Over Written Protest Under an Unwritten "Protocol"***

¶54. The summer before Plaintiff's progression review, Plaintiff discovered suspected academic misconduct by three students in his Summer Session 2024 course — submissions reflecting technical material not taught in the course that did not match the assigned question — and contacted them for an explanation, as OCCS policy required. Ex. 4-A

¶55. On July 11, 2024, Plaintiff reported the matter — concerning Danny Kalarical and Aaleyah Vaughn — to Lima, copying Julie Wong, Undergraduate Student Affairs Coordinator and Plaintiff's Executive Assistant, as well as the students' academic advisor. Kalarical and Vaughn denied wrongdoing and declined to meet, and Vaughn accused Plaintiff of discrimination and threatened, in capitals, to see him fired. Compare ¶ 99. Ex. 4-C, 4-i3

¶56. The next day, Plaintiff reported the lawsuit threat to Lima, who replied that "[t]he university has protocols in place to handle these situations" and asked Plaintiff to send the information to OCCS in organized form; Plaintiff submitted the report to OCCS after Lima vetted and approved it. Ex. 4-D

¶57. On September 25, 2024, Lima said Noel would not refer the matter to disciplinary proceedings and that there be "no appeal or such," directing Plaintiff to disregard written College policy stating the opposite.

¶58. Plaintiff sought clarity from Noel on the matter and on Lima's instruction. Noel referenced "guidelines adopted by some departments, including the Economics department," which Plaintiff stated he did "not have access to" — commencing the year-long effort to obtain them.

¶59. Plaintiff reasonably believed his objections regarding not confronting students suspected of cheating before reporting them implicated FERPA and his academic-misconduct-reporting duties under College and University policies.

9

¶ 60.  Asked about entering the grades given Noel's informal resolution, Noel said it was up to Plaintiff but "[w]hatever you do, you should get that in writing from Victor Lima—to protect yourself." Ex. 4-F

¶ 61.  On November 4, 2024, Lima demanded the students' grade breakdowns stripped of the cheating penalty that same day, dismissing Plaintiff's request for two days; the next day he had Plaintiff hold the grades and keep his rubrics "in case there is a complaint." Ex. 4-F, 4-i6

¶ 62.  On March 11, 2025, Lima resumed the grading matter in a new thread copying Nusbaum and Shaikh that omitted his earlier instructions to delay submission, and directed Plaintiff to "submit a grade of A- for Danny Kalarical and a B for Aaleyah Vaughn." Ex. 4-H

¶ 63.  On March 12, 2025, under the submission deadline, Plaintiff entered the grades while stating he was "very displeased at being coerced to turn in grades [he didn't] believe the student ha[d] earned," and that they did not reflect the syllabus or his academic judgment. Ex. 4-I

### *Non-Progression Decided Before the Process Ran*

¶ 64.  On June 13, 2024, Lee, Lima, and Yoshida met with Plaintiff about the Fall 2024 progression review.  Lima said that the terminal seventh-year entitlement was uncertain absent progression; most of the conversation concerned the classroom observation.

¶ 65.  Gina Pieters, another Economics AIP, had not been progressed after grieving her pre-review PIP — and had her own history with Neal, who complained beforehand that observing her was a waste of his time and left roughly ten minutes into her lecture.  She told Plaintiff in Winter 2024.

¶ 66.  Plaintiff had two courses available for his Fall 2024 observation.  Lima listed six prospective observers for Econ 20100 — including Neal — and four for Econ 11020, with no Neal; Plaintiff, with exaggerated body language, chose the latter.  Lima then volunteered that Neal had also taught econometrics — though not Plaintiff's course — and might be eligible to observe.

¶ 67.   In an internal email on October 10, 2024 (which Plaintiff received through the Union's July 2025 discovery production ("Union Discovery")), Shaikh asked Neal and Richert to serve on Plaintiff's progression committee.  Neal indicated reluctance because he was on leave, and Manick said Neal could skip the observation; Yoshida intervened, stating Neal was needed because it was Plaintiff's "promotion review."

¶ 68.   Six days before the observation, Yoshida's Interfolio recommendation letter called Plaintiff a dedicated lecturer, highly valued, with evaluations consistently above departmental averages and a most recent observation showing excellent organization and delivery, and concluded he would advocate for Plaintiff's promotion and retention. Ex. 5-B, 5-i2

¶ 69.   On October 20 or 21, 2024, Yoshida told Plaintiff in the hallway that Neal and Richert would also observe. Plaintiff sent all five observers a welcome note, slides, and a pedagogical introduction, since none had taught the course.

¶ 70.   On October 22, while the lecture was still ongoing, Neal emailed Lee, Lima, and Yoshida that he had "seen enough to make a judgement," the lecture was "not good enough," and "probation with a remediation plan is the best possible outcome" (received months later via Union Discovery). Ex. 22-D, 22-E

¶ 71.   On October 30, 2024, Yoshida emailed the nine-page Observation Report for the next-day debrief. Ex. 5-C Asked for overall observations, Lima said "[e]verything we want to convey is in the report" and the meeting ended mutually; Yoshida said the fourteen-day response clock had started the day before.

¶ 72.   The Observation Report again devoted two of its nine pages to slides, faulting Plaintiff because, "[d]espite our strong recommendation to make use of the board," he "continued to rely on slides and refused to use the board." Ex. 5-C, 5-i3 Compare ¶¶ 32.

¶ 73.   On November 13, 2024, after the Observation Report criticized his slides, Plaintiff sought accommodation for his dysgraphia, including protection from negative evaluation for using slides instead of handwriting. Ex. 7-A

¶ 74.   On November 21, 2024, Fulya Ersoy, an Assistant Instructional Professor in the same Department, observed Plaintiff teaching the same course the reviewers had condemned and reported she "was particularly impressed by Dr. Vasudevan's ability to distill a challenging topic into a clear and engaging presentation." Ex. 5-K, 5-i11

¶ 75.   Within the fourteen-day window, Plaintiff submitted a timely written response to the Observation Report ("Obs. Report Response") to Lee, Lima, Neal, Richert, Yoshida, and Manick, explaining that the course relied on real-world datasets and that he used slides rather than board work

due to prior feedback and handwriting-related functional limitations. Ex. 5-E

¶ 76. On November 18, 2024, Plaintiff emailed Neal to request a meeting. Neal replied he was "firmly convinced . . . your contract should not be renewed." At the meeting he told Plaintiff "There's no way in hell that I'm going to let them renew your contract," would make "a hundred percent sure" the faculty respected the reviewers' recommendation, and told him to "start looking for a job." Ex. 22-J

¶ 77. On November 21, 2024, Plaintiff met with Shaikh, identifying defects in the observation process offering a new CBA-compliant observation as resolution, and stating he intended to grieve. Shaikh said he understood those to be important worker protections, and that he was unaware of the relevant CBA provisions, including the terminal seventh-year appointment. Plaintiff also relayed that Neal had stated he would see through Plaintiff's "nonrenewal." Shaikh assured Plaintiff the full review packet would be carefully read (compare ¶ 93), and when Plaintiff asked that his response to the Observation Report be read, said it would be.

¶ 78. After the meeting, Plaintiff emailed Shaikh requesting, as the sole remedy, that the observation be redone per the CBA, and disclosing his EOP accommodation request regarding board work and slides — which Shaikh forwarded to Manick, who shared it with Kaftanich and Leibsker. Shaikh did not respond, did not provide the requested personal-statement deadline, and did not arrange a new observation.

¶ 79. Christina Brown, Assistant Professor in Economics, on November 20, 2024 submitted an Interfolio letter, also intended to be part of his packet, calling Plaintiff an "excellent instructor" with "stellar student course evaluations," and described his project-based econometrics teaching, mentorship, service, and collegiality. Brown would later vote against his progression by email. Ex. 5-I

¶ 80. On November 21, 2024 (Personnel File; ¶ 223), Manick wrote Kaftanich, "Victor is still having concerns about the 7th year." Kaftanich replied, "If the vote for progression is no, we have to do the terminal 7th year or pay him out," and asked, "Does Srini know he is not getting progressed?"; Manick replied, "He does." This exchange came nearly two months before the faculty vote.

*First Grievance: Violation Admitted, Remedy Denied, Evidence to Be Scrubbed*

¶ 81.  On November 21, 2024, the Union filed the First Grievance on Plaintiff's behalf, asserting that the classroom observation was conducted without the advance notice of the observer's identity required by CBA Section 5(A) (¶ 69). Ex. 13-C, 13-i3

¶ 82.  On November 21, 2024, Manick reported to Shaikh that she had spoken with Kaftanich and forwarded Shaikh's emails to her, and that Kaftanich "did recommend not changing the promotion committee" (Personnel File).

¶ 83.   On December 2, 2024, Manick wrote Shaikh, Lima, and Yoshida that after the coming arbitration session "we should be able to schedule a faculty meeting to discuss . . . promotions. . . and then have the faculty vote" (Personnel File).

¶ 84.  At a December 4, 2024 grievance meeting with Kaftanich and Leibsker, attended with Union Representative Loren Ezra Whitman, Plaintiff reiterated that his sole requested remedy was a new classroom observation conducted in compliance with the CBA.

¶ 85.  The University's December 13, 2024 Step 3 Answer, signed by Leibsker, acknowledged lecturers must be "notified of the identity of observers at least fourteen . . . days prior to the observation," but said the CBA "does not specify what the remedy is" and denied the grievance as unreasonable. On January 16, 2025, the Union recommended the First Grievance (GV411766; ¶ 81) for arbitration. Ex. 5-H, 5-i8

¶ 86.  On February 14, 2025, Kaftanich wrote Yoshida that Anneliese Wermuth (Vice Chair, Labor and Employment Department, Cozen O'Connor, P.C., and the University's counsel) had "advised holding another observation with two observers," which "would remove the other observation from the report and make no mention of handwriting in the new one," so that "Srini won't have this in his arsenal when he ultimately files a grievance," and asked whether they had "time to quickly do another observation." Plaintiff first saw this email in December 2025 (¶ 223). Ex. 21-V

¶ 87.  On December 19, 2024, Marquetta Scott of EOP issued Plaintiff a written accommodation determination, copying Shaikh and Lima, finding no requirement to handwrite content during classroom instruction; Plaintiff confirmed his understanding that with no requirement there was no penalty for using slides. Compare ¶ 72. Ex. 7-C, 7-i3

13

¶ 88.  Across two accommodation meetings Scott first doubted the Report faulted Plaintiff's slides over handwriting given his dysgraphia, then, after meeting Shaikh and Lima, confirmed the department did not require handwriting; asked if she now understood, she answered "Yes, now I do."

¶ 89.  On February 7, 2025, Scott affirmed her December 19 determination on her supervisors' say-so, directing concerns to them.  At the January 31 meeting, when Plaintiff tried to respond, she said "[W]e are going around in circles" and abruptly ended the call.  Ex. 7-E, 7-i5

¶ 90.  On February 20, 2025, Velasquez affirmed on the same supervisor-sourced basis and rejected Plaintiff's January 15 request (¶ 94) that the Report not be circulated, calling distribution "a procedural matter distinct from the essential duties" and the decision "final."  Ex. 7-F, 7-i6

### *A Curated Review Packet, Stripped of Every Favorable Record*

¶ 91.  The Provost's instructional-professor guidelines made the appointee's personal statement required review material and located the student evaluations' probative value in the appointee's demonstrated response to criticism, rather than in the evaluations themselves.  Ex. 9-A, 9-i1

¶ 92.  On January 7, 2025, Manick set a January 10 deadline for Plaintiff's personal statement — after ignoring his requests for one throughout Fall 2024 (¶ 78) — then extended it to January 21; he submitted on time for the review packet.  Ex. 5-K, 5-i11

¶ 93.  On January 13, 2025 — before Plaintiff submitted his statement — department faculty received Plaintiff's "case packet," containing his CV, the Committee's Memo, and the Observation Report (¶ 71); the Memo stated Plaintiff's Obs. Report Response would be appended, but it was not.  Ex. 5-F, 5-E

¶ 94.  On January 15, 2025, Plaintiff wrote Scott that retaining and circulating the Observation Report's handwriting sections and using them in his promotion decision "will amount to discrimination based on disability" — unaware the faculty had voted two days earlier (¶ 123).  Ex. 7-D, 7-i4

¶ 95.  The packet also omitted the eight student letters, the three faculty support letters, Plaintiff's personal statement, and Yoshida's own contemporaneous assessment (¶ 68) — which predated the Observation Report by six (6) and the Memo and contradicted the packet's adverse assertions.

¶ 96.  The review packet omitted letters that supported promotion — the faculty letters of Professors Dube and Dean and the student letters — which praised precisely the teaching the memoranda

disparaged; the Chair's Memo named the letters but engaged none of their content. Ex. 5-G

¶ 97.   The Committee's Memo revived the closed December 2020 TA issue (¶ 24) as "inappropriate treatment of a TA," and used the Summer 2024 Econ 15500 episode as a "Classroom Management" basis for non-progression. Ex. 5-F, 6-D

¶ 98.   It imputed dishonesty and professional unfitness. The full set of challenged statements is set out in the Table of Challenged Statements. Ex. 6-A

¶ 99.   As to "Protocol adherence," the Memo charged Plaintiff with failing to report the suspected cheating and compromising the OCCS's process. Compare ¶¶ 55, 56. Ex. 6-B

¶ 100.   The Memo was not an individualized assessment of Plaintiff. Its description of his "teaching portfolio" attributed to him courses he has never taught — "Econ 18010: Introduction to Managerial Economics" and "Econ 26040: Human Capital and the Economy" — reproducing the portfolio breakdown from the contemporaneous review memo of a comparator instructional professor.

¶ 101.   The Memo asserted core-course weaknesses, particularly in basic price theory; no observed lecture in the period the Memo covered was a price-theory course, and the price-theory weakness was itself recycled from the Department's most recently non-progressed instructional professor, who had announced it to the instructional-professor group in January 2024. ¶¶ 39, 66, 65. Ex. 6-E

¶ 102.   Twenty-seven sequential redlined drafts of the Observation Report show favorable observations progressively stripped: the first draft's "significant improvement" assessments were removed and the final asserts his lecture "did not improve in significant ways."

¶ 103.   The Memo faulted Plaintiff for following his 2023 "Memorandum"'s direction to adopt the comparator's practices (¶ 43), including simulated data Neal later denounced — which Plaintiff flagged in his Obs. Report Response (¶ 75), read by Neal but never shared with faculty.

¶ 104.    The University later could not identify the Protocol it had invoked to criticize Plaintiff's handling of the student-misconduct issue (¶¶ 58, 201).

¶ 105.    The Memo stated that "the OCCS exonerated the students"; its own Appendix, supplied by Noel, reported that there had been no determination of responsibility, that no policy barred confronting students, and that Vaughn's email was protected activity rather than a sanctionable threat. Ex. 5-F, 6-G

¶ 106.   On or about January 21, 2025, Shaikh distributed his Chair's Memo dated January 12, 2025, to Woodward, Nusbaum, and Hale with subject "Request not to promote Srini Vasudevan". After approval, it was transmitted to the Provost and placed in Plaintiff's personnel file. Ex. 5-J, 5-i10

¶ 107.   At the January 13, 2025 faculty meeting, Richert — who had concurred in the Observation Report's adverse account — added an adverse oral account of Plaintiff's classroom handling, contradicted by his own October 22, 2024 contemporaneous notes. Ex. 6-H

¶ 108.    It falsely asserted Plaintiff refused to meet the Co-Directors about the observation — contradicted by the record's own debrief (compare ¶ 71) — and was republished over six months and used to withhold the CBA-required Memo. Ex. 6-C

¶ 109.   On May 2, 2025, in an internal email (disclosed in the Personnel File in December 2025), Lima wrote to Leibsker (copying Shaikh and Harper) that "Kotaro informed Srini verbally on 10/10/24" that Neal and Richert would attend the observation — "13, instead of 14 days" before. The date was false: notice came on October 20 or 21, 2024 (¶ 69), recasting a one- or two-day notice as thirteen days.

¶ 110.    The same emails recast the debrief (¶ 71) and the review timeline. Lima acknowledged that "during the debrief we did not discuss [Plaintiff's] performance over all areas" — "because he opted out" — while Yoshida wrote Plaintiff "did not engage" with a report he "had not reviewed." On timing, Lima wrote the reviewers as of October 30, 2024 "still did not have Srini's personal statement," though Manick first set that deadline on January 7, 2025 (¶ 92).

***The "Liquidity Seminar": An Exclusionary Access Channel, Investigated by the Accused***

¶ 111.    Plaintiff reported a supervisor-hosted, alcohol-centered access channel that excluded non-drinkers, including employees avoiding alcohol for medical reasons relevant to disability rights and for religious or pregnancy-related reasons relevant to Title VII. Gould and Shaikh narrowed or dismissed that report. Ex. 10-A

¶ 112.   The announcements recurred: Yoshida's May 15, 2024 "liquidity seminar" at "Bar Yoshida"; a November 20, 2024 gathering with drinking "optional but encouraged"; and a notice placing "[t]he quarterly liquidity seminar. . . in Kotaro's Bar after 6pm." Ex. 10-B, 10-C

¶ 113.   On March 6, 2025, the morning after Plaintiff's report, Shaikh forwarded it to Dean Woodward

(Personnel File), describing "allegations against one of our SIPs" and suggesting "brett liebsker advise us on how to respond." Woodward replied, "This is a very serious set of allegations . . . I'll loop in Bridget Collier and Brett," and directed Harper to work with Collier, Leibsker, and Shaikh on the response — while Plaintiff's grievances and arbitration scheduling were pending.

¶ 114.   On March 7, 2025 — before any meeting with Plaintiff and before his testimony — Gould emailed Shaikh under the subject line "green light" (Personnel File), stated that "Brett likes the plan," and proposed language for Shaikh to send to Plaintiff. Ex. 10-D

¶ 115.   At the March 10, 2025 meeting, Plaintiff testified while Gould read from a printed copy of his emailed complaint and asked questions tied to its text; Gould then asked Leibsker whether she and Shaikh should write the response, defending the practice by citing "substantial debate about the modeling of drinking behavior to students." Ex. 10-E

¶ 116.   In his March 13, 2025 memorandum to Shaikh (Personnel File), Yoshida acknowledged timing deliberately "minimizing student visibility," a regular-attendee group of Pablo Peña (Assistant until 2025 and now Associate Instructional Professor in Economics), Ryan Fang (Associate Instructional Professor in Economics), Rui Zhao (Associate Instructional Professor in Economics), and Pieters with Plaintiff only "[i]ntermittent," that select-group events "may be perceived as fostering favoritism or exclusivity," and that groupwide invitations had gone out only "for the past three gatherings." Ex. 10-F, 10-i6

¶ 117.   The one gathering both Pieters and Plaintiff attended (December 1, 2022), they came upon while coordinating a bowling outing, finding Yoshida, Fang, and Peña drinking in Yoshida's office. Founders Peña and Fang were promoted; Plaintiff and Pieters were not.

¶ 118.   At that gathering, when Pieters asked whether she would be invited in the future, Yoshida replied that "this has been an old-boys' club so far."

¶ 119.   On March 13, 2025, Gould emailed Leibsker, Woodward, and Harper (copying Shaikh) the "tempest in a teapot" message (Personnel File) while Plaintiff's progression review and grievance were active (¶ 81), disparaging Plaintiff's testimony (¶ 115); it recast the report as "access to the boss," adopted Yoshida's "low-key social event" description, noted the tequila should leave his office "given the circumstances," and concluded "[t]here is no there there." Ex. 10-G, 6-F, 10-i7

17

¶ 120. On April 17, 2025, Shaikh and Gould issued the outcome letter dismissing the complaint —
no interviews of Plaintiff's witnesses, no application of the Alcohol and Other Drugs policy governing
University functions where alcohol is served — calling the names "playful and rather clever" and the
gatherings "inclusive" because "all are invited." Compare ¶ 116. Ex. 10-H, 10-L

¶ 121. The gatherings continued after the letter, including a May 21, 2025 "liquidity seminar"
announced by Yoshida. Ex. 10-I

### *Stonewalled Records and a Summary Letter Engineered to Prevent Pushback*

¶ 122. Meanwhile, beginning February 26, 2025, Plaintiff repeatedly asked the Department and
Dean's office for his reviewers' identities, the performance-review report/memos, and an opportunity
to respond before the decision, citing CBA Sections 4(F), 4(G), 4(C), and 5(A); none had been
provided. Manick and Shaikh were recipients.

¶ 123. The Faculty voted unanimously against Plaintiff's progression: fifteen faculty voted against
promotion at the meeting, and eight more concurred by email — among them Christina Brown, who
seven weeks earlier had written a letter supporting Plaintiff's promotion. Twelve faculty did not vote;
none voted to promote. Ex. 5-J, 5-I

¶ 124. On March 3 and 7, 2025, Kaftanich stated Plaintiff's reviewers "were Victor Lima and Kotaro
Yoshida" — false: the committee was Lee, Lima, Neal, Richert, and Yoshida, and he had never been
told. Compare ¶ 69.

¶ 125. On March 7, 2025, Plaintiff replied to Kaftanich (copying Manick, Shaikh, Lima, and
Yoshida) that the University's debrief account was false, and that he was "extremely alarmed at the
constant misrepresentation of events and deception of university officials by Victor Lima." ¶ 110.

¶ 126. On March 11, 2025, Kaftanich refused to provide the review report before the decision,
stating it "will be shared. . . along with the decision. . . on May 15th," that the University "will not
be deviating from our process," and that disagreement could be grieved afterward.

¶ 127. On March 11, 2025, Plaintiff emailed Shaikh that his "progression review had gone off the
rails" and requested a meeting to discuss an informal, amicable resolution without further grievance
proceedings.

¶ 128. The next day, Leibsker emailed Shaikh (Personnel File), "Srini is certainly the gift that keeps

18

giving," and advised Shaikh to "speak with him, but make no commitments," adding that if Plaintiff appealed "the decision not to reappoint" to arbitration, "we will look better... for engaging with Srini rather than cutting him off."

¶ 129.   On March 13, 2025, Kaftanich sent Leibsker and Shaikh a "Srini Update" (Personnel File) listing options "that might encourage Srini to end the grievance and accept the non-progression outcome" — and weighed Plaintiff's immigration status in that calculus: "Srini is currently being renewed for an H1-B visa while his LPR is pending.  Becoming unemployed during this process would be pretty devastating." Ex. 20-C, 21-M

¶ 130.   Plaintiff later learned that for Ersoy's Fall 2026 re-appointment the University disclosed the committee in advance, noticed observation dates by mutual agreement, let her read the Report before her debrief, and set a statement deadline — none of which Plaintiff received.  Compare ¶¶ 69, 71, 92.

¶ 131.    Plaintiff received none of these:  his reviewers withheld then misstated, his observation noticed only verbally one or two days ahead, the report given the evening before his debrief, his statement solicited only after the faculty vote. ¶¶ 124, 69, 71.

¶ 132.   On March 24, 2025, Leibsker advised internally (Personnel File) that the University should not present a proposed resolution directly to Plaintiff, but should route it through outside counsel to the Union's attorney, aiming to have Plaintiff withdraw the grievance or settle to withdraw it.

¶ 133.   On April 2, 2025, Yoshida circulated a draft performance-summary letter (Personnel File), copying Lima, Lee, Manick, Kaftanich, and Shaikh, and stated that the writers had kept it "short and to the point in order to prevent any pushbacks."

¶ 134.   The two-page summary letter cited "[e]rrors and inaccuracies" in materials and an "[i]nability to combine mathematical arguments with compelling graphical alternatives," but never mentioned slides or the board — despite their prominence in the Observation Report (¶ 72) and 2024 memoranda.

¶ 135.   On April 4, 2025, Shaikh sent the non-progression decision, attaching Plaintiff's terminal-year contract and a thin summary letter; Plaintiff was instructed to sign and return the contract within fourteen (14) days. Ex. 11-A

¶ 136.   On April 14, 2025, while the Department discussed Plaintiff's post-non-progression course schedule and job-search flexibility, Leibsker stated (Personnel File) that the University should not go

out of its way to accommodate Plaintiff's job search unless Plaintiff dropped the grievance.

¶ 137.    The Committee's Memo was altered before the University produced it to the Union. The Memo as circulated to Department faculty on January 8 and 13, 2025, prior to the faculty vote, recommended, "Our recommendation is that the university allow Mr. Vasudevan's contract to expire on August 31, 2025 and not pursue progression to Associate Instructional Professor." and concluded, "Consequently, we would like to recommend that the University terminate Mr. Vasudevan's employment upon the expiration of his current contract on August 31, 2025." In the copy the University produced to the Union for arbitration those same two sentences read, "Our recommendation is that the department does not pursue Mr. Vasudevan's progression to Associate Instructional Professor." and "Consequently, our recommendation is that the department does not pursue Mr. Vasudevan's progression to Associate Instructional Professor." — the actor changed from the University to the department, the action from terminating Plaintiff's employment to declining to pursue progression, and the August 31, 2025 expiration date deleted. Ex. 5-F (UD-B371–414), Ex. 21-E, Ex. 21-F

### *Second Grievance: A Denied Step 3*

¶ 138.  On April 30, 2025, the Union filed the Second Grievance (GV412056) at the First Step. The Second Grievance asserted the University violated Article 16, Sections 4(G) and 4(H) (reviewer notice and written-response rights) and Article 7 (non-discrimination) by evaluating Plaintiff negatively for his ADA requests, and sought removal of the non-promotion and a repeat evaluation. Ex. 13-C

¶ 139.  On April 30, 2025, Plaintiff attended a combined Step 1+2 meeting with Shaikh and Harper (without a Union Representative present); Lima was added without notice.

¶ 140.  Shaikh gave no substantive reasons for the non-progression. Told the reviews had repeatedly faulted him for not writing on the board (¶ 72), Shaikh reframed it as "a metaphorical board," meaning "the ability to respond to student questions in real time."

¶ 141.  Shaikh stated "[t]here is no requirement" and "[n]o one is required to write on the board," yet described the expectation as producing content in real time — not necessarily "writing with your hand" but "having a laptop ready and a display."

20

¶ 142.   On May 1, 2025, in an email to Lima (copying Harper and Shaikh; from Personnel File), Leibsker wrote "Anna [Wermuth] can relay to the attorney our responses... in the hopes the attorney can... convince him he will never be progressed and to look for other ways to settle this." Ex. 21-U

¶ 143.   Internally, on May 8, 2025, Leibsker had written to Harper (Personnel File) that the University would "skip the 3rd step meeting that Srini mentioned," and that "the Office of the Provost has no interest in reversing the decision."

¶ 144.   On May 12, 2025, at the direction of Union Representative Andrew Yale, Plaintiff emailed Provost Baicker requesting a Step 3 meeting under the CBA; he received no response.  By contrast, two other Bargaining-Unit grievances set for Fall 2026 arbitration have received a Step 3 meeting with Assistant Provost Jackson.

¶ 145.   After Plaintiff emailed the Provost seeking a Step 3 meeting, Shayla Nguyen (Union Staff Attorney), after meeting with Wermuth, told Plaintiff to cease further internal communications with the Provost's Office — contradicting Yale's direction — on the ground that such discussions were not "privileged."

¶ 146.   The Union did not obtain a Step 3 response either:  from June through July 2025, Plaintiff repeatedly asked Union representatives Whitman and Nguyen whether the University had issued a written Step 3 response, and Nguyen stated, "I have not received the third step response."

¶ 147.   Meanwhile, on May 12, 2025, Plaintiff had received and signed his revised Terminal-Year Contract, providing six courses across 2025–2026, two per quarter, plus student advising and administrative duties under departmental direction — its course changes made through mutual agreement.  On May 15, 2025, he returned the signed revised contract to Harper, stating the acceptance did not alter his filed concerns about the evaluation and non-progression or his grievance and arbitration remedies. Ex. 11-B, 11-C, 11-i3

¶ 148.  Plaintiff's employment contracts since 2021 — including the terminal-year contract — carried the same term: "any additional assignments may be made only by modification of this letter." The University knew how to modify (the May 12 revision (¶ 147) and the February 12, 2026 addendum (¶ 210)). Yet the changed Winter and Spring duties (¶ 179), the schedule Lima declared "supersedes" his contract (¶ 206), and the leave work-demands (¶ 215) were imposed by no modification. Ex. 3-C,

21

11-B

***Arbitration Abandoned at the Hearing-Room Door***

¶ 149.   On July 26, 2025, during settlement discussions, Plaintiff informed Matt Carpenter (the Union's General Counsel) and Nguyen he would not sign a global release, but drew no clear answer on the University's position.  On July 29, 2025, Carpenter volunteered unprompted that the grievances would likely be denied, urged Plaintiff to settle, and said that once a decision issued the Union would treat the matter closed, with no appeal.

¶ 150.   The Union's first substantive witness prep was July 31–August 1, 2025, days before the August 4 hearing; the recently admitted attorney said she was "learning this along with you," had not reviewed key documents, and twice told Plaintiff he would likely lose.

¶ 151.   Around the same period, Whitman refused Plaintiff's request for copies of the filed grievances, stating that the Union does not provide internal documentation.

¶ 152.   During preparation sessions on July 30 and 31, 2025, Nguyen and Wesley Payne (also a Union Staff Attorney) handled witness and evidentiary preparation, and Nguyen stated that Carpenter and Wermuth had spoken by phone a day or two prior, that Wermuth had called Nguyen "incompetent," and that Wermuth had stated that "[Plaintiff's] refusal to settle was damaging the University's relation with the Union."

¶ 153.   Before the hearing, Wermuth conveyed the University's planned arguments to the Union in writing, including, on information and belief, that Plaintiff's dismissed complaint against Yoshida (¶ 120) showed he was "biased."  Leibsker had proposed this relay on May 1, 2025 (¶ 142). Ex. 21-U

¶ 154.   Further, Nguyen stated that Carpenter and Wermuth were on "good terms," which she gave as the reason for Carpenter's insistence on settling the matter.  Nguyen reported being reprimanded by Carpenter, and said she was unhappy and looking for another job.

¶ 155.   Before the hearing, Wermuth raised arbitrability with the Union.  On August 4, 2025, Plaintiff appeared before the Arbitrator with the Union (Nguyen, Payne, Yale) and the University (Leibsker, Wermuth).  In an attorney-only meeting, Wermuth presented it before the Arbitrator as notice to the Union; Nguyen and Payne were nonetheless unprepared to argue it, and Wermuth proposed mediation instead.

22

¶ 156.   Having investigated, filed, and approved the grievances for arbitration, selected the arbitrator, scheduled the hearing, prepared witnesses, and appeared for the August 4 proceeding, the Union then abandoned the arbitration.

¶ 157.   Arbitrator Malin had set caucus discussions confidential, offers made only in joint session. While Plaintiff was outside consulting counsel — on the understanding no offer would issue until he cleared it — Payne disclosed the caucus position to the University side, including Wermuth, outside Plaintiff's presence. Ex. 13-B

¶ 158.   When Plaintiff learned of the disclosure and objected, Payne told the Arbitrator, "Sorry to step in your shoes as mediator but we are running out of time," and Nguyen added "this wasn't a formal offer."  When the Arbitrator suggested direct presentation of Plaintiff's position, Payne rejected Plaintiff's request that his personal counsel address the Arbitrator by phone, saying, "The Union is going to say no to that." Ex. 13-B

¶ 159.   After that, the caucus and joint-session structure effectively ceased; Payne conducted discussions outside joint session, and Wermuth returned intermittently with sequential offers, then presented an offer she described as final and lower than the amount Plaintiff had stated was a redline.

¶ 160.   After she departed, Payne and Nguyen repeatedly pressed Plaintiff to accept it as the University's final offer; Nguyen said, "Yes, I have a life." Under that pressure, Plaintiff agreed to the framework and signed a hastily put together "Term Sheet". Ex. 13-B

### *A Settlement That Was Not the Deal Struck*

¶ 161.   On August 21, 2025, Nguyen sent an agreement stating Plaintiff had "until September 7 to review and sign." The draft, a "Settlement Agreement and General Release," departed from the parties' Term Sheet: it required release of "all known and unknown claims . . . grievances and causes of action," withdrawal of pending charges, and added termination-for-cause, return-of-property, attorneys'-fees, and no-sue terms. Ex. 12-A, 12-B

¶ 162.   On August 21, 2025, Plaintiff objected the release was sweeping and asked it adhere to the Term Sheet. On August 30 and 31, he returned redlines and requested arbitration. On August 31, 2025, Carpenter responded that the Union would withdraw the grievances unless Plaintiff accepted

the draft settlement as-is. Ex. 12-C, 13-A, 13-i1

¶ 163.  On September 2, 2025, Plaintiff declined to sign, requested resumption of the arbitration process, and proposed an alternative that would allow him to pursue claims in other forums.  Carpenter rejected the proposal and wrote that throughout the process Plaintiff had "denigrated Local 73" and "belittled" Union staff, "particularly Ms. Nguyen." Ex. 13-B

¶ 164.  Plaintiff asked Carpenter to identify any instance; Carpenter identified none, replying only that he would not "go back and forth" and repeating the demand to settle.  That same day, Carpenter added, "arbitration is not yours to demand" and "the Union will not be demanding that we proceed to arbitration on your grievances." Ex. 13-B, 13-i2

¶ 165.  After Plaintiff again sought copies of the grievances (¶ 151), Carpenter produced them on September 9, 2025; on September 23, 2025, Carpenter admitted in writing that the Union had done nothing with the grievances except forward Plaintiff's note to Arbitrator Malin at his request. Ex. 13-C, 13-D, 13-i4

¶ 166.  On September 26, 2025, Plaintiff filed an NLRB charge against the University (Case 13-CA-374077) alleging Section 8(a)(1) retaliation, and on September 28 a charge against SEIU Local 73 (Case 13-CB-374096) under Section 8(b)(1)(A) for Carpenter's threats and the Union's bad-faith grievance handling.

¶ 167.  On December 16, 2025, email auto-reply indicated Nguyen had left the Union.  Payne was not responsive.  Asked on December 27 whether Payne was licensed when he represented Plaintiff before Arbitrator Malin, Carpenter never responded; Plaintiff's search of the Illinois attorney registry found no record of Payne. Ex. 13-E, 13-F

¶ 168.  On May 11, 2026, Plaintiff asked the Union in writing whether the grievances remained pending or withdrawn. On May 12 and 14, Carpenter responded that the Union had "not taken any further action with the grievances" since September 23, 2025 (¶ 165) and "will not be demanding . . . arbitration."  When Plaintiff asked again, yes or no, whether they had been withdrawn and on what date, the Union did not respond. Ex. 13-G, 13-i7

***Cost-Free Accommodations Denied, Leaving Medical Leave the Only Exit***

¶ 169.  With the grievance and arbitration channel closed, control over Plaintiff's terminal year

24

passed entirely to the University's own processes — leave, return, access, and course assignments.

¶ 170.  By September 2025, Plaintiff's longstanding psychiatric condition had relapsed following the sustained sequence of adverse actions and hostile communications described above.  Plaintiff's medical providers advised limiting work involving high-intensity social settings such as classroom instruction while following an otherwise structured daily routine to aid recovery.

¶ 171.    On September 10, 2025, Plaintiff submitted an ADA accommodation request to EOP, identifying essential functions (teaching six Economics courses yearly, advising, MA admissions, professional development) and requesting three accommodations:  rescheduling Fall 2025 teaching to a later quarter, key instructions in writing, and a written interactive process.  Ex. 14-A, 14-B

¶ 172.  After his written-process request was rejected (¶ 171), Plaintiff negotiated Zoom recordings of the accommodation meetings as a compromise.  Scott, assigned to the September 18 and October 24, 2025 meetings, went on leave the day before; Velasquez replaced her only on his insistence.  Ex. 19-G

¶ 173.  In the September 18, 2025 ADA interactive-process meeting, Plaintiff told Velasquez his three psychiatric diagnoses had recently been exacerbated (racing thoughts, sleep problems, irritability, impulsivity); his doctor advised avoiding Fall classroom instruction to return to baseline, while one-on-one or small-group advising could aid recovery.  Ex. 19-G

¶ 174.  Asked in that meeting whether there had been quarters in which he had not taught, Plaintiff answered, "Not in the past for me, but there have been other instructors who haven't taught."

¶ 175.    Velasquez stated that he would contact Shaikh and Lima and make a determination in consultation with Collier.

¶ 176. On September 22, 2025, Velasquez denied the Fall 2025 teaching-rescheduling accommodation, stating teaching was an essential duty expected each quarter whose removal would fundamentally alter an essential requirement.  The letter encouraged Plaintiff to explore FMLA and disability leave and said EOP would review his remaining requests later.  Ex. 14-C, 14-i3

¶ 177. Department colleagues later confirmed the Department itself had arranged quarters with no teaching: Chris Roark, then-Assistant Instructional Professor in Economics, described "[o]ne quarter I had off with no classes," and Peña a quarter "with 0 load"; AIPs in other departments reported similar scheduling.

25

¶ 178.  On November 19, 2025, two months after EOP had deferred the remaining request, Velasquez denied Plaintiff's written-instruction accommodation, stating leadership routinely used email and would keep conveying time-sensitive instructions in writing, and Plaintiff could provide a brief summary after in-person meetings.  It further stated that Plaintiff's duties were already enumerated in his May 12 contract (compare ¶ 203).  The letter copied Lima and Scott. Ex. 14-D, 14-i4

¶ 179.  On December 3, 2025 — two weeks after justifying its denial on the ground that Plaintiff's duties were already enumerated in the May 12 contract — Lima issued changed Winter and Spring duties almost entirely different from those stated in the contract (¶ 203). Ex. 14-E, 14-F

***Unwritten Leave Restrictions, Nonconsensual Disclosure, and Comparators Spared***

¶ 180.  Following the September 22 denial (¶ 176), Plaintiff met with Gould, the University's leave administrator for academic appointees, to discuss leave options.  Before any formal leave request or designation had been made, Gould informed Manick that Plaintiff would be taking medical leave, and Manick relayed that information to Plaintiff while copying Shaikh and Lima, thereby disclosing Plaintiff's anticipated medical leave without Plaintiff's consent.

¶ 181.  In written follow-up to questions about leave rights, Gould stated Plaintiff had no office access while out sick, should not use the library, and "definitely" no professional-development or research-grant funds while on leave, adding, "If you are well enough to participate in professional activities, we expect you to be at work" — while clarifying that Plaintiff could visit campus to pick up a sandwich but not attend professional events. Ex. 15-A, 15-i1

¶ 182.  Plaintiff replied in writing to Gould, copying Manick, objecting point by point that the restrictions were unlawful: the lost professional-development funds violated the CBA, restrictions on research activity and lost grant funds interfered with his contractual and statutory obligations as a human-subjects Principal Investigator, and the directives cancelling his conference participation and barring communal-space access were "unlawful interference and unlawful harassment." Ex. 15-B

¶ 183.  During the leave-application process, Plaintiff received shifting instructions on whether to submit the FMLA form, the OAA short-term-disability form, or both.  On October 8, 2025, Gould said the forms were being redone because "they confuse people".

¶ 184.  Weeks into his leave, Plaintiff had received no approval or designation notices or balance

accounting — needed to plan future FMLA leave for his ailing parents and disabled sister in India; when he followed up, Gould said she did not know whether there would be further documentation, and no approval or designation notices, and no accounting of his designation or balance, ever came.

¶ 185.   During Plaintiff's leave, in response to a Departmental grant staff's routine sub-contract question, Manick told the staff, copying Plaintiff, that he was on FMLA, had requested long-term disability, and could not do research.  Plaintiff asked Manick to identify the governing policy and stop disclosing his leave status; Manick identified no consistently applied written policy and directed him to Gould.  Gould did not respond. Ex. 15-E, 15-F, 15-G

¶ 186.   Prior to this exchange, Manick had approved professional-development expenses in October 2025, but denied identical expenses in November 2025 and deducted them from Plaintiff's pay. Ex. 15-D, 15-J

¶ 187.   On November 6, 2025, Lima told Plaintiff that Plaintiff's medical leave precluded participation in the MA Working Group on AI Policy, directed Plaintiff to refrain from attending meetings while on leave, and conveyed this to the convener of the committee, copying Leibsker. Ex. 15-H, 15-I

¶ 188.   Velasquez, by contrast, at the accommodation meeting in September, 2025 prior to leave had confirmed Plaintiff could continue advising students if he chose, but his thesis advisees were reassigned and never restored.

¶ 189.   Neal, a senior faculty member, was actively recruited while on leave to serve on a consequential progression committee (Plaintiff's; ¶ 67), while Plaintiff's FMLA leave was treated as a categorical bar on ordinary professional activities.

¶ 190.   On information and belief, tenure-track faculty on academic leave routinely incur or are reimbursed for research, conference, travel, and professional-development expenses; Plaintiff's comparable expenses were denied, reversed, or treated as personal because his leave was medical.

¶ 191.   Near his leave's end, preparing to return for Winter 2026, Plaintiff was forbidden to interview or hire teaching assistants until the leave formally ended — while other instructors recruited, depleting the candidate pool. Compare ¶ 189. Ex. 15-K, 15-L

¶ 192.   Upon Plaintiff's return from leave, the University did not restore him to the same or an equivalent position. Core student-facing responsibilities were removed, including advising duties,

which Plaintiff valued most in his role (¶ 188).

¶ 193.   After returning from leave, Plaintiff sought his remaining FMLA balance (¶ 184).  On January 21, 2026, Manick replied only with his professional-development balance, professing not to know what an FMLA balance meant. Ex. 16-C

*A "Protocol" That Could Not Be Produced, Then Appeared with No Adoption Date*

¶ 194.    Plaintiff's return to work put the review's central premise — the purported academic-misconduct "Protocol" (¶ 99) — back in issue.  In July 2025, Plaintiff had obtained, through the Union, the Committee's Memo he had long sought from the University.  The Memo stated that Plaintiff had not followed the "Protocol" for handling academic misconduct cases.

¶ 195.   On July 12, 2025, in order to obtain the Protocol, Plaintiff reminded Noel that in November 2024 she said she was ascertaining the policy with Lima and Wong, noted Lima's instruction barring any confrontation of students except in-exam cheating contradicted OCCS policy, and again asked for the guidelines.  He received no response. Ex. 17-A, 17-i1

¶ 196.    After not receiving any such Protocol, on July 19, 2025, Plaintiff submitted an Abuse of Authority to Gould, Nusbaum, and Shaikh about Lima's conduct related to the coerced grade alteration in March 2025 and requested reassignment to a different supervisor pending resolution.

¶ 197.   The University was contemporaneously aware that Plaintiff's mental condition was fragile.  In the same complaint chain, on July 23, 2025, Plaintiff wrote Gould, copying Shaikh and Nusbaum, that assembling and narrating the complaint's parts had been "both time-consuming and psychologically paralyzing, especially given the nature of the events I am describing and having to revisit them," and that proceeding in parts "helped me compartmentalize and protect both my work time and mental health." Ex. 4-I

¶ 198.    Gould repeatedly delayed the investigation by requesting more materials while Plaintiff remained under Lima's supervision, and — though stating she had not reviewed his complaint — pre-emptively asserted the University's CBA right to change an instructional professor's grade (¶ 62).

¶ 199.   On September 29, 2025, Plaintiff wrote Noel that the referenced protocol "does not in fact exist," that Noel had "concealed" its non-existence and "stonewalled" him, and that he would follow written policy absent it. Ex. 17-B

28

¶ 200.  Noel replied eight minutes later that she "believe[d] that Econ has a practice," that refining it remained "on [her] to-do list," and that she "didn't have information [she] could share to answer [his] questions, and still d[id]n't." She directed Plaintiff to the Department. Ex. 17-C

¶ 201.   On December 23, 2025, Lima set out for the first time a written "internal protocol" for academic-dishonesty cases (compare ¶ 56), "not to be included in the syllabus," routing cases through a Department administrator before OCCS. Ex. 17-D

¶ 202.  On December 26, 2025, Plaintiff asked Nusbaum and Provost Jackson to clarify the Protocol, which contradicted established policy. Lima replied on January 5, 2026 that it was "confirmed . . . consistent" but would not say when it was adopted, and directed compliance. Ex. 17-E

*A Unilaterally Rewritten Contract and Heavier Load During Medical Leave*

¶ 203.  On December 16, 2025, after Plaintiff asked Leibsker to confirm that his assignment remained as in his May 12 contract, which was two (2) specified courses each quarter, Leibsker directed him to Lima.

¶ 204.  The collapsed settlement never fixed a three-section Spring load: the August 5, 2025 Term Sheet offered only "[o]ne course release during the quarter of [Plaintiff's] choosing," contingent on his release of all claims, a $25,000 payment upfront, and grievance withdrawal — none of which occurred. Plaintiff's "0–2–3" was his own proposed arrangement, not an agreed term. Ex. 12-A

¶ 205.   On September 9, 2025, after the settlement collapsed, Leibsker wrote that Plaintiff's "assignment will be based on [his] May 2025 Appointment Letter because the course releases were offered in exchange for [his] release of all claims." The same day, Lima "confirm[ed]" a one-Fall, two-Winter, three-Spring load; and the University's course catalog listed the same assignment. Ex. 11-H

¶ 206.  On December 23, 2025, Lima stated that "[t]his revised schedule supersedes the one outlined in [Plaintiff's] contract" and held him to the altered load (¶ 147). Ex. 11-D, 11-i4

¶ 207.   Plaintiff objected in writing to the unilateral modification of the contract and notified the contract signatories, Jackson, Nusbaum, and Woodward, of the violation.

¶ 208.   After the Fall flip-flops, Plaintiff sought clarity before applying for leave. On February 2, 2026, Harper stated "[t]he University's policy is that there be no research account/PD expense

29

reimbursements while someone is on FMLA," calling the rule "absolute and uniformly applicable." The restrictions, as Plaintiff recited them back without correction, further barred him while on FMLA from University committees or a professional seminar paid by University funds. Compare ¶ 186. Ex. 16-A, 16-B

¶ 209.   On February 5, 2026, Plaintiff again objected after the University listed the additional course under his name, stating he was committed to the signed contract and would teach only the two assigned courses; the course remained listed.

¶ 210.   On February 12, 2026, Manick sent an addendum purporting to modify the contract to assign three Econ 11020 sections in Spring 2026, relieve two MA duties (advising and admission-applications review), and leave pay untouched ("your other compensation will be:  No change."), stating that "[f]ailure to acknowledge this addendum does not absolve you from your responsibility for the revised list of duties." Plaintiff did not acknowledge it. Compare ¶ 206. Ex. 11-F, 11-i6

¶ 211.   By February 23, 2026, the University was aware of Plaintiff's federal lawsuit, NLRB charge, and EEOC/IDHR charge, before formal service. That day — eleven days after the addendum purporting to add a third Spring course (¶ 210) — outside counsel offered to buy out the rest of Plaintiff's contract, relieving him of all duties, for withdrawal of the lawsuit and charges and a release of all claims. Plaintiff declined the next day. Ex. 11-G, 11-i7

¶ 212.   On February 26-27, 2026, Plaintiff requested the published policies supporting that and the other restrictions; Harper directed him to Gould, and no published policy was produced. Ex. 16-D, 16-E

¶ 213.   After the unilaterally increased teaching load and hostile communications, Plaintiff's condition fully relapsed (compare ¶ 170).

¶ 214.   Plaintiff went on leave for Spring Quarter 2026, using his remaining FMLA balance and the rest unpaid.  Again, the University did not provide any approval or designation notices (¶ 183). Gould provided a confusing accounting of the leave balance across FMLA and non-FMLA leave categories. Ex. 16-F

¶ 215.   During the Spring 2026 leave, the University treated the annual faculty report as a normal work record; Departmental work requests (grade-average reports, a Lima-directed exam-absentee

30

spreadsheet task, with reminder) likewise continued to issue during the leave.

¶ 216. Plaintiff's non-active professional-development expenses, such as professional-organization dues and subscriptions to software tools, which had been approved during Fall Quarter 2025, were denied during Spring Quarter 2026 (compare ¶ 186).

¶ 217. By contrast, Ersoy continued professional activities during her coterminous Spring 2026 leave. Her identical professional-development expenses, including the same AI-tool subscription denied to Plaintiff, were approved and reimbursed, as she confirmed by text in May 2026; she continued serving on the same year-long working group Plaintiff was removed from (¶ 187); and her continuity work was demanded and accepted, without the restrictions imposed on Plaintiff. Compare ¶ 208.

***Exhaustion of Administrative Remedies: WHD, EEOC/IDHR, and NLRB***

¶ 218. On November 26, 2025, Plaintiff filed a Department of Labor Wage and Hour Division FMLA complaint (ID 5090479); WHD declined to investigate, but investigator Diane Milic advised him he had a basis to pursue it in federal court. Ex. 18-A, 18-B, 18-C

¶ 219. On November 28, 2025, Plaintiff submitted an EEOC inquiry, No. 440-2026-01709, identifying disability and retaliation, including repeated failures to accommodate, denial of the September 2025 scheduling and November 19, 2025 written-communication accommodations, and retaliation for reporting the supervisor-hosted alcohol-centered gatherings. The EEOC's backlog placed Plaintiff's intake appointment months out; to preserve timeliness, Plaintiff proceeded by walk-in intake (¶ 221). Ex. 19-A

¶ 220. After exhausting internal, CBA/Union, WHD, and NLRB channels (the last carrying an "extremely large backlog"), Plaintiff filed this federal action on January 7, 2026.

¶ 221. On January 12, 2026, Plaintiff filed a Charge of Discrimination, No. 440-2026-01709, through a walk-in intake, against the University, dual-filed with the EEOC and the Illinois Department of Human Rights ("IDHR") , alleging disability discrimination, failure to accommodate his need not to handwrite and for written instructions and a schedule adjustment, and retaliation for reporting discriminatory workplace practices. Ex. 19-B, 19-C

¶ 222. The University filed a position statement on February 17, 2026; Plaintiff responded on April 16, 2026, and filed an addendum on April 21, 2026. On April 30, 2026, the EEOC issued Plaintiff

31

a Determination and Notice of Rights on Charge No. 440-2026-01709, and on May 18, 2026, the Illinois Department of Human Rights issued a Notice of EEOC Adopted Finding on IDHR Charge No. 2026CR1761. Ex. 19-D, 19-E, 19-H, 19-I

***The Personnel File Revealed, Notice Given, Nothing Corrected***

¶ 223. On December 17, 2025, Plaintiff requested his personnel file; Theodore Stamatakos, Senior Associate General Counsel, produced via Box only a curated mbox of emails from November 18, 2024 through July 1, 2025, with no answer as to the file's completeness. Ex. 20-A

¶ 224. On January 6, 2026, Plaintiff gave written notice that the placement of his medical and disability information in his personnel file violated ADA/FMLA confidentiality and demanded removal; Stamatakos refused and declared the matter his "final communication." Ex. 20-D, 20-E

¶ 225. On information and belief, Kaftanich, Leibsker, and Wermuth accessed Plaintiff's confidential medical and disability information without his consent; the University likewise gave its Office of Legal Counsel access to the file, and provided Plaintiff no notice of that access.

¶ 226. After reviewing the 170-email curated mbox (¶ 223), Plaintiff gave the responsible University actors express written notice, on January 5, 7, 11, and 14, 2026, that the file revealed unlawful conduct — including Kaftanich's "arsenal" email (¶ 86), the disclosure of his disability information, and statements about his professional conduct "that you know to be false" — and demanded they stop. None led to any record correction or remedial action. Ex. 8-A, 8-C, 8-D, 20-H

¶ 227. Further, Plaintiff requested interim reassignment of supervisory control over conflict, retaliation, and supervisory-integrity concerns (¶ 196). Stamatakos directed him back to the purported retaliator and to the Union for remedy. Plaintiff's appeal to Paul Alivisatos, President of the University, went unanswered. Ex. 20-B, 20-C

¶ 228. On January 5 and 6, 2026, Plaintiff objected to Gould's March 13, 2025 "tempest in a teapot" characterization (¶ 119), provided his transcript of the March 10, 2025 meeting, and requested correction of the record; no corrections were provided. Ex. 10-K

¶ 229. On January 6, 2026, having received no response, Plaintiff referred the matter, with his record of the meeting and the University's on-campus alcohol-use policy, to Collier, the University's Associate Provost for Equal Opportunity Programs, copying Gould, Leibsker, Woodward, Harper,

32

and Shaikh. On January 26, 2026, Collier dismissed it, reasoning the gatherings "are open to all" (compare ¶ 116) and alcohol "is not a requirement."

¶ 230. On February 1, 2026, Plaintiff gave written notice to Stamatakos and Wermuth, copying the Provost, that confidential letters of support written by eight students had been disclosed to Local 73 unredacted. Plaintiff received no response; his June 2, 2026 follow-up also went unanswered. Ex. 20-G

¶ 231. On February 2, 2026, Plaintiff notified Deans Hale and Philip Venticinque that the file disclosed to Local 73 included Noel's student-disciplinary memorandum; Hale said the College was "already looking into it," but nothing followed. Ex. 20-G

¶ 232. On June 16, 2026, after briefing its motion to dismiss, the University certified Plaintiff's personnel file complete, omitting the approved April–June 2026 personal-leave authorization and the February 12, 2026 courseload addendum (¶ 210). Ex. 20-H

**Part E: Claims for Relief**

**Count I: Discrimination, Failure to Accommodate, Confidentiality Breach, and Retaliation (ADA: 42 U.S.C. §§ 12112(a), 12112(b)(5)(A), 12112(d)(3)–(4), 12203(a).)**

**Defendant: UChicago.**

¶ 233. Plaintiff is a qualified individual under 42 U.S.C. § 12111(8): his ADHD, dysgraphia, and bipolar disorder substantially limit major life activities — handwriting, concentration, mood and sleep regulation; with accommodation, he can perform his essential functions. ¶¶ 23, 24, 26, 28, 39.

¶ 234. The University is a covered employer with actual knowledge of Plaintiff's disability and his formal accommodation requests. ¶¶ 24, 25, 26, 35, 36, 41, 43, 87, 170, 171.

¶ 235. Plaintiff requested reasonable, available accommodations. The University granted none, did not engage in a good-faith interactive process, restricted his professional access during leave, and refused to correct disability-tainted records after notice, breaching its accommodation duty. ¶¶ 23, 27, 43, 73, 89, 170, 171, 173, 174, 175, 176, 178, 181, 192, 188, 228, 88, 172, 33.

¶ 236. The University obtained Plaintiff's medical information through the accommodation process and owed it confidentiality. Instead it disclosed his medical-leave and disability status to individuals with no need to know and refused after notice to remove the materials from personnel records, causing

33

concrete professional injury. ¶¶ 37, 38, 180, 185, 186, 224, 225, 232, 230, 231.

¶ 237.  The University denied Plaintiff's progression because it relied on the disability-tainted review; but for his disability and the tainted review, that denial and those restrictions would not have occurred. ¶¶ 22, 28, 29, 40, 42, 72, 32, 86, 100, 101, 66, 135, 140, 181, 185, 209, 228.

¶ 238.  Plaintiff engaged in ADA-protected activity by requesting accommodations, opposing unlawful conduct in his personnel file through written notice, and filing an EEOC inquiry; the University denied or restricted accommodations and maintained the challenged record shortly after these protected acts, showing causal connection. ¶¶ 170, 173, 176, 178, 180, 181, 185, 209, 219, 222, 226, 229, 211.

¶ 239.  Plaintiff exhausted or timely invoked administrative remedies through EEOC Charge No. 440-2026-01709 and dual-filed with IDHR, receiving a Determination and Notice of Rights. ¶¶ 219, 220, 221, 222.

¶ 240.  Each theory in this count is within, or reasonably related to, Plaintiff's administrative charge and each requested accommodation, and the medical-confidentiality conduct was expressly raised in Plaintiff's written EEOC submissions. ¶¶ 219, 221, 222.

**Count II: Interference and Retaliation (FMLA: 29 U.S.C. §§ 2611(4), 2614(a), 2615(a)(1), 2615(a)(2), 2617(a).)**

**Defendants: UChicago, Gould, Harper, Leibsker, Lima, Manick, Shaikh.**

¶ 241.  Plaintiff was an FMLA-eligible employee, having been employed full time since 2019 and meeting the service and hours thresholds. The University was a covered employer meeting the size and proximity threshold. Plaintiff gave notice and took leave. ¶¶ 12, 180.

¶ 242.  Plaintiff was entitled to protected leave, designation notice and information, and restoration to an equivalent position. The University denied each entitlement: it gave no timely designation or required leave information, imposed leave-linked restrictions, altered his assignments on return, and refused equivalent restoration, prejudicing him beyond the ordinary consequences of absence. Without designation notices or an accounting of his balance, Plaintiff could not plan protected leave to care for his parents, and he entered the Spring 2026 leave nearly uncovered. ¶¶ 180, 181, 183, 184,

185, 191, 192, 188, 193, 214, 148.

¶ 243.   Plaintiff took approved FMLA leave and opposed unlawful leave conditions in writing. During that leave and after he asserted his FMLA rights, the University and its officials pressed work demands, maintained leave-linked restrictions, and took materially adverse actions because of the leave; timing and subject matter support retaliatory motive. ¶¶ 182, 180, 185, 186, 187, 208, 213, 215, 216, 218, 224, 226, 148.

¶ 244.   A similarly situated instructional professor, reviewed by the same decisionmakers, took protected leave yet escaped the restrictions imposed on Plaintiff. ¶¶ 74, 130, 131, 124, 177, 189, 190, 217.

¶ 245.   Each named individual is an "employer" under 29 U.S.C. § 2611(4), having exercised authority and control over Plaintiff's leave-related terms, and is liable only for his or her own conduct: Gould imposed and communicated the leave restrictions; Manick disclosed Plaintiff's leave status and deducted approved expenses from his pay; Lima barred working-group participation and issued the altered Winter duties; Leibsker reiterated the altered assignment; Shaikh received the leave disclosures and assignments without correction; Harper announced the purported "absolute and uniformly applicable" reimbursement bar. ¶¶ 182, 15, 21, 180, 181, 185, 186, 187, 193, 203, 208, 212.

¶ 246.   Plaintiff suffered damages recoverable under 29 U.S.C. § 2617(a). ¶¶ 184, 213.

**Count III: Retaliation for Protected Opposition (CRA: 42 U.S.C. §§ 2000e-3(a), 2000e-5(g).)**

**Defendant: UChicago.**

¶ 247.   Plaintiff reported to Equal Opportunity Programs a supervisor-hosted, alcohol-centered professional-access gathering disadvantaging pregnant and religious employees and reported it as such. He reasonably and in good faith believed the practice was unlawful discrimination. ¶¶ 111, 112, 113, 114, 116, 117, 118, 120, 121.

¶ 248.   After Plaintiff's opposition to workplace discrimination, the University excluded him from professional opportunities, its investigator rationalizing it as reflecting unsuitability. Each action would dissuade a reasonable worker; timing supports retaliatory motive. ¶¶ 113, 114, 116, 119, 115, 120, 153.

¶ 249.     Plaintiff exhausted or timely invoked administrative remedies through EEOC Charge No. 440-2026-01709 and received a Determination and Notice of Rights; this Title VII retaliation claim is within or reasonably related to his charge because the charge alleged retaliation for the same course of protected opposition. ¶ 220.

**Count IV: CBA and DFR Breaches (LMRA: 29 U.S.C. § 185(a); 29 U.S.C. § 159(a).)**

**Defendants: UChicago, Local 73.**

¶ 250.   The CBA between the University and Local 73 is a contract under 29 U.S.C. § 185(a), and Plaintiff was in the bargaining unit Local 73 exclusively represented under 29 U.S.C. § 159(a).

¶ 251.   This hybrid claim requires proof of the University's CBA breach and Local 73's duty-of-fair-representation breach. The breaches are interdependent: the University's violations created the grievances; Local 73's refusal to process Plaintiff's Grievances to resolution blocked the remedy.

¶ 252.     The University breached mandatory CBA progression review and grievance protections (acknowledged it in the Step 3 Answer to the First Grievance), denied the required Step 3 process for the more consequential Second Grievance. The defects violated Article 16 sections 3 and 4 and Article 8 section 3 step 3[1] and were material, affecting the observation, the decision record, Plaintiff's ability to rebut, and non-progression outcome. ¶¶ 64, 97, 67, 69, 70, 76, 71, 75, 77, 78, 85, 126, 138, 143, 144, 145, 146, 137, 83.

¶ 253.     As exclusive bargaining representative, Local 73 owed Plaintiff fair representation and breached that duty: its grievance handling was arbitrary and in bad faith, not mere negligence. Its duty was not to predict the arbitration outcome but to reasonably investigate whether the admitted violations materially affected the review and non-progression decision. ¶¶ 80, 84, 149, 162.

¶ 254.   Local 73 acted arbitrarily and perfunctorily: it performed no timely or minimally adequate investigation or preparation for the grievances it controlled, though a substantial factual basis for arbitration sat uninvestigated. ¶¶ 145, 149, 150, 151, 152, 154, 155, 156, 164.

¶ 255.   Local 73 failed to preserve the contractual remedy: securing no Step 3 answer or grievance

---

[1]Article numbering follows the collective bargaining agreements in force through the review and grievances (2018–2021 and 2021–2024), in which the review protections appear as Article 16; the successor 2024–2029 CBA renumbers them as Article 18 without changing the operative clauses. The grievance article is Article 8 throughout.

resolution, discouraged Plaintiff's self-help channels without a reasoned decision, and never clarified the grievances' status. ¶¶ 85, 122, 127, 138, 139, 142, 143, 145, 168.

¶ 256.   Local 73 acted in bad faith, using its exclusive control over the arbitration to press settlement terms beyond the grievance remedy. It paused the already-prepared arbitration to explore settlement, then coerced a term sheet instead of resuming the same day (the standby court reporter, headphones on, released by the Arbitrator once the Union declined to go back on the record); it came to the mediation unprepared, with no offer or counteroffer of its own and the burden left on Plaintiff; its counsel disclosed Plaintiff's confidential caucus position to the University side, outside his presence, the Arbitrator's presence, and the joint-session process; and after Plaintiff rejected the written settlement and requested ressumption of already-prepared-for arbitration, it refused to resume the already-prepared arbitration, threatened to withdraw the grievances, baselessly accused him of denigrating Local 73 and abandoned them into status fog. ¶¶ 152, 155, 157, 158, 159, 160, 161, 162, 163, 164, 167.

¶ 257.   In sequence, the University's breach and Local 73's DFR breach together deprived Plaintiff of the grievance and arbitration process needed to remedy the review, causing loss of appointment, terminal-year employment, and reputational injury. Damages should be apportioned: each defendant is liable for the harm its own breach caused. ¶¶ 132, 145, 155, 162.

¶ 258.   This claim is timely: the six-month period began no earlier than the Union's post-rejection refusal to resume the already-approved arbitration and Plaintiff filed this action on January 7, 2026, within six months. He exhausted the available contractual steps or was excused because the Union controlled and blocked them, and diligently sought clarification. ¶¶ 77, 78, 81, 162, 164, 165, 166, 168.

**Count V: Disability Discrimination and Failure to Accommodate (UChicago); Retaliation and Aiding or Abetting (UChicago and Individual Defendants) (IHRA: 775 ILCS 5/2-102(A), 2-102(J), 6-101(A), 6-101(B).)**

**Defendants:  UChicago (2-102(A), 2-102(J), 6-101(A)); Collier, Gould, Kaftanich, Leibsker, Lima, Neal, Scott, Shaikh, Velasquez, Woodward, Yoshida (6-101(A), 6-101(B)).**

¶ 259. Plaintiff is a person with a disability under the Illinois Human Rights Act, and the University a covered employer directly liable under 775 ILCS 5/2-102(A), 5/2-102(J), and 5/6-101(A). ¶¶ 26, 173.

¶ 260. Each individual who retaliated against Plaintiff for protected activity is directly liable as a person under 775 ILCS 5/6-101(A). In addition, under 775 ILCS 5/6-101(B), a person who knowingly aids, abets, compels, or coerces a civil rights violation is individually liable; the University's IHRA violations described above support its direct liability, and each named individual acted to enable, encourage, or implement those violations. ¶¶ 62, 76, 106, 133, 261.

¶ 261. The University permitted disability linked criticism in Plaintiff's progression review despite his disclosed limitations, relied on the tainted review against him, and refused correction after notice. These predicate violations of 775 ILCS 5/2 102(A), 5/2 102(J), and 5/6 101(A) ground the direct and aiding and abetting claims. ¶¶ 28, 29, 42, 43, 72, 32, 101.

¶ 262. Each individual defendant acted with knowledge of Plaintiff's disability and protected activity and knowingly participated: Kaftanich (¶ 86, ¶ 82, ¶ 226); Lima (¶ 22, ¶ 87, ¶ 89, ¶ 90, ¶ 176, ¶ 178, ¶ 226); Yoshida (¶ 22, ¶ 226); Velasquez (¶ 90, ¶ 176, ¶ 178, ¶ 226); Scott (¶ 87, ¶ 89, ¶ 94); Collier (¶ 175, ¶ 87, ¶ 89, ¶ 90, ¶ 176, ¶ 178, ¶ 229); Neal (¶ 76, ¶ 75, ¶ 226); Shaikh (¶ 77, ¶ 87, ¶ 89, ¶ 90, ¶ 226); Leibsker (¶ 84, ¶ 226); Gould (¶ 182); and Woodward (¶ 113, ¶ 226). Each is liable only for his or her own conduct.

¶ 263. These individual acts occurred after notice: each defendant knew or was specifically informed — by direct written notice or by Plaintiff's written submissions in the review and administrative process — that the progression review was disability tainted and continued, maintained, or failed to correct the conduct. ¶¶ 75, 77, 125, 139, 224, 226, 227, 229.

¶ 264. Plaintiff exhausted or timely invoked administrative remedies through IDHR Charge No. 2026CR1761 and related EEOC proceedings, and this IHRA claim — including the claims against the named individuals — is within or reasonably related to those proceedings. Plaintiff's handwritten charge individually named each individual defendant to this Count as responsible for the challenged actions, and each knew or should have known his or her conduct was subject to the Commission's inquiry: UChicago's Position Statement addressed their conduct and was signed by defendant Velasquez, and each could participate through the University and shared counsel. ¶¶ 221,

38

222.

**Count VI: Retaliation for Protected Refusals (IWA: 740 ILCS 174/20 [as amended, 1/1/2025], 174/20.1, 174/20.2, 174/30.)**

**Defendants: UChicago, Gould, Lee, Lima, Noel, Shaikh, Yoshida.**

¶ 265.    Despite direction and pressure, Plaintiff refused to participate in activities that would have violated, or that he reasonably and in good faith believed would violate, State or federal law, rule, or regulation: he refused directed grade changes that would falsify academic records contrary to FERPA, Title VI, and the Higher Education Act, entering the directed grades only under an express submission deadline while disclaiming them in writing; he refused directives to alter admissions-review judgments through an improper admissions practice, yielding only under direct order; and he refused to suppress the academic-misconduct reporting that governing policy required, and reported despite discouragement. ¶¶ 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 60, 61, 62, 63, 99, 104, 194.

¶ 266.   After Plaintiff's refusals, the University recoded them as misconduct warranting discipline and preserved those retaliatory predicates in his review record; maintaining a shifting grading-policy rationale internal non-progression emails support pretext. ¶¶ 53, 58, 59, 97, 98, 99, 105, 195, 196, 198, 200, 199, 201, 202, 226, 103, 30, 34.

¶ 267.   Causation appears from knowledge and sequence: Plaintiff's refusals preceded the adverse actions, the decisionmakers knew of them, and the refusal-derived narrative carried into the adverse result. ¶¶ 44, 63, 128, 135, 226.

¶ 268.    Each named individual acted as the University or its agent within the meaning of the Act: Lima, Noel, Lee, and Yoshida issued or enforced the directives Plaintiff refused; Shaikh carried the refusal-derived narrative into the review; and Gould asserted the University's grade-change authority. ¶¶ 62, 195.

¶ 269.   As a result of the retaliation, Plaintiff suffered non-progression and reputational injury, and is entitled to relief under 740 ILCS 174/30. ¶¶ 135, 181.

**Count VII: Defamation Per Se**

**Defendants: Gould, Lee, Lima, Neal, Richert, Shaikh, Yoshida.**

¶ 270. This Count is pleaded against Gould, Lee, Lima, Neal, Richert, Shaikh, and Yoshida, each of whom published the statements attributed to him or her. ¶¶ 31, 67, 79, 76, 91, 92, 93, 106, 109, 119, 115, 122.

¶ 271. Each challenged statement was a false assertion of fact published to University faculty, administrators, and third parties, and defamatory per se: each imputed inability to perform or want of integrity in Plaintiff's profession. The statements were presented as factual findings, not opinion or hyperbole, are not capable of innocent construction, and implied undisclosed defamatory facts. ¶¶ 98, 99, 105, 107, 109, 134, 137.

¶ 272. The challenged statements are catalogued in the Table of Challenged Statements — each with its speaker, publication, the true state of the record it contradicted, and the professional unfitness it imputed — which is incorporated in this Count as if fully set forth herein. Ex. 6-A–6-J

¶ 273. This Count is timely: the January 13 and 21, 2025 publications to Department faculty and the Provost's chain—which included the Observation Report—fall within one year of filing, and each statement was also republished within the one-year period, each republication independently actionable. The University circulated the false statements to new recipients, including its Office of Legal Counsel and Local 73, and kept publishing the statements after his notice of falsity. ¶¶ 108, 110, 125, 194, 223, 225, 226, 228.

¶ 274. Each publisher had actual knowledge that the statements were false or recklessly disregarded their truth, holding the records that contradicted them when they published: Neal, Lee, and Richert (¶ 70, ¶ 76, ¶ 75, ¶ 66, ¶ 102); Lima and Yoshida (¶ 133, ¶ 125, ¶ 110); Shaikh (¶ 77, ¶ 141, ¶ 128); and Gould (¶ 115, ¶ 119).

¶ 275. Any qualified privilege for these review communications was abused: the publications were one-sided, omitted Plaintiff's known rebuttal materials and were made with knowledge of or reckless disregard for falsity and with retaliatory motive. ¶¶ 93, 95, 105, 96.

40

**Count VIII: Breach of the Terminal-Year Employment Contract**

**Defendant: UChicago.**

¶ 276.   The May 12, 2025 Appointment Letter [Revised], signed by Plaintiff and the Provost's designee, is a valid and enforceable individual employment contract.  It fixed Plaintiff's salary, professional-development funds, and an enumerated teaching load — two sections each in Fall, Winter, and Spring, including "two sections of Econ 11020 . . . in Spring 2026" — and provided that "any additional assignments may be made only by modification of this letter." ¶ 147.

¶ 277.   This claim is not preempted by Section 301 of the Labor Management Relations Act.  Although the Letter issues under the CBA, it expressly "sets forth the details of [Plaintiff's] appointment," and the breached term — the enumerated Spring load — is one such detail:  enforcing "two sections of Econ 11020 . . . in Spring 2026" requires reading the Letter, not interpreting any CBA provision. The University's HR Assistant Vice President confirmed as much, stating Plaintiff's "assignment will be based on [his] May 2025 Appointment Letter." ¶¶ 147, 205, 169.

¶ 278.   Plaintiff accepted the terminal-year contract while expressly preserving, in his written transmittal of the signed contract, his objections to the evaluation, the non-progression decision, and his grievance and arbitration remedies — which were pending when he signed — forming a binding contract. ¶¶ 135, 138, 144, 147, 209.

¶ 279.   Plaintiff performed, or was ready, willing, and able to perform, the terminal-year appointment: he signed and returned the contract, returned from approved medical leave, and committed in writing to teach the two Spring sections the Letter required. ¶¶ 147, 209.

¶ 280.   The University materially breached the two-per-quarter load term of the Appointment Letter, which permitted additional assignments "only by modification of this letter." After the settlement collapsed — when, as Leibsker confirmed, the load reverted to the Letter — the University imposed three Econ 11020 sections in Spring 2026.  That load appears in no operative document: the Letter fixed two, and the Term Sheet offered only a single course release, never a third Spring section. It was imposed by no modification and over Plaintiff's written non-consent. ¶¶ 147, 148, 205, 204, 206, 210, 207, 136.

¶ 281.    The breach caused Plaintiff damage, including the loss of the bargained terms of his terminal-year appointment and its value to him; he is entitled at least to nominal damages, and to declaratory and injunctive relief enforcing the Letter's terms. ¶ 147.

**Part F:  Relief Sought and Jury Demand**

¶ 282.   Plaintiff respectfully requests judgment against each Defendant on the counts for which it is liable; declaratory relief that Defendants' conduct violated his statutory, contractual, and common-law rights; injunctive and equitable make-whole relief, including reinstatement or front pay, record correction; compensatory damages; liquidated, punitive, exemplary, statutory, or nominal damages as authorized; costs, expenses, and fees; and all other relief the Court deems just and proper.

¶ 283.   Plaintiff demands a trial by jury on all issues so triable.

Respectfully,
/s/ Srinivasan Vasudevan
July 20, 2026
1649 East 50th Street, Unit 4A, Chicago, IL 60615
Email:  srinivasan.vasudevan000@gmail.com
Phone:  (773) 786-3785