**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SRINIVASAN VASUDEVAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 26 C 211** |
| | ) | |
| **THE UNIVERSITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

The Court dismissed Srinivasan Vasudevan's amended complaint for failure to state a claim. Vasudevan has filed a second amended complaint. The defendants have moved to dismiss. The Court addresses their motions in this order.

The second amended complaint, like the previous versions, arises from Vasudevan's employment as an "assistant instructional professor" at the University of Chicago, a non-tenure track position. Vasudevan began his employment in September 2019. In that capacity, he was a member of a bargaining unit represented by Local 73 of the Service Employees International Union.

Vasudevan's first amended complaint included only three counts. The first was a "hybrid" claim alleging a breach by the University of the collective bargaining agreement (CBA) of which Vasudevan is a beneficiary and a breach by Local 73 of its duty of fair representation. The second count included claims for defamation *per se*. And the third count asserted a claim for interference with his rights under the Family and Medical Leave Act. As indicated, the Court dismissed that complaint, with leave to amend. *See*

*Vasudevan v. Univ. of Chicago*, No. 26 C 211, 2026 WL 1862231 (N.D. Ill. June 29, 2026).

In amending, Vasudevan hasn't doubled-down; it's more like he has octupled-down. The second amended complaint ostensibly has eight counts, but several of those contain multiple claims, so the real total is at least a couple dozen claims. For example, Count 1, brought under the Americans with Disabilities Act, alleges violations of four separate prohibitions in the statute (discrimination, failure to accommodate, breach of confidentiality, and retaliation), and multiple violations of at least some of those provisions. Exactly how many is difficult to count, as the relevant paragraphs of the second amended complaint each cross-reference ten or more separate earlier paragraphs of the complaint. *See* 2d Am. Compl. ¶¶ 235-38. Depending on how one counts, it's possible that Count 1 contains as many as a dozen separate claims. Count 2, asserted under the FMLA, contains fewer alleged violations than Count 1, but potentially as many as a half-dozen. *See id.* ¶¶ 242-43. Count 5, a claim under the Illinois Human Rights Act's prohibitions and requirements relating to persons with disabilities, includes at least as many alleged violations as Count 1. Count 7, a claim of defamation *per se*, lumps together seven individual defendants and cites as many as a dozen separate allegedly defamatory statements.

**1. Rules 8(a)(2) and 10(b)**

Vasudevan's second amended complaint collides with two provisions of the Federal Rules of Civil Procedure. The first is Rule 8(a)(2)'s requirement that a complaint include "a short and plain statement of the claim[s]" asserted by the plaintiff. Fed. R. Civ. P. 8(a)(2). The second amended complaint is exactly the opposite of that:

it is forty-two pages long and, for the most part, reads like a blow-by-blow description of the events underlying the claims that Vasudevan is attempting to assert. And that's not all; the attachments include dozens of pages of exhibits and spreadsheets that summarize them, all of which Vasudevan incorporates into his complaint. This is not the "short and plain statement" that Rule 8(a)(2) calls for.

The second provision Is Rule 10(b), which says that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count . . . ." Fed. R. Civ. P. 10(b). This complaint screams out to be organized that way. In its current form, it's just plain too difficult to sort out exactly what claims Vasudevan is asserting, particularly with regard to his ADA, FMLA, and IHRA claims. *See, e.g., Cable v. Kuraray Am., Inc.*, No. 24-1233, 2024 WL 4499766, at *3 (7th Cir. Oct. 16, 2024) ("We have upheld the dismissal of similarly prolix and discursive complaints that failed to provide a short and plain statement of the claim."). To be clear, there's nothing wrong with asserting multiple claims; the problem is lumping multiple claims together in a single count.

Because Vasudevan's second amended complaint runs afoul of these rules, he is going to have to give it one more try. There are, however, certain claims and points that the Court *can* deal with on the merits. Doing so will to some extent simplify the task of preparing a proposed third amended complaint. The Court therefore proceeds to address those claims and points.

**2. Defamation *per se* claims**

First, all of Vasudevan's defamation *per se* claims are legally deficient and are dismissed with prejudice. The Court previously dismissed the parallel claim(s) in

Vasudevan's first amended complaint, which did not measure up to the requirements of Illinois law for a defamation *per se* claim. Specifically, the Court stated:

> Vasudevan asserts a claim of defamation *per se*, which lies if a statement's harm is obvious and apparent on its face. *Id*.; *see* Am. Compl., count 2, title. In Illinois, only five categories of statements are considered defamatory per se:
>
> > (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.
>
> [*Green v. Rogers*, 234 Ill. 2d 489, 491–92, 917 N.E.2d 450, 459 (2009).] Vasudevan's amended complaint references the third (and perhaps the fourth) category: he alleges that the defendants made "statements of fact concerning Plaintiff that imputed a lack of integrity, competence, or fitness to perform Plaintiff's profession . . . ." Am. Compl. ¶ 79.

*Vasudevan*, 2026 WL 1862231, at *4. But, the Court concluded, the allegedly defamatory statements that Vasudevan cited did not "impute[ ] a lack of integrity, competence, or fitness on his part to perform his profession. Instead, they involve specific alleged missteps." *Id.* The claim was therefore deficient.

The same is true of the defamation *per se* claim(s) asserted in Count 7 of Vasudevan's second amended complaint. In the operative paragraph of his defamation count, 2d Am. Compl. ¶ 270, he cites as defamatory the statements referenced in paragraphs 31, 67, 79, 76, 91, 92, 93, 106, 109, 110, 115, and 122. Most of these cross-references are incoherent; they don't actually refer to purportedly false statements of fact by anyone about Vasudevan. *See, e.g.*, 2d Am. Compl. ¶¶ 31 (the University placed him on a performance improvement plan), 67 (internal emails asking persons to serve on Vasudevan's "progression committee"), 79 (reference to *positive* comments by

an individual about Vasudevan plus that individual's vote against him), 76 (statements by an individual to Vasudevan himself, not to someone else), 91 (reference to certain instructional professor guidelines), 92 (an individual set a deadline for Vasudevan to meet a particular requirement), 93 (a particular document did not contain an appendix that it was supposed to contain), 109 (statement that someone had told Vasudevan about who would attend an observation), 122 (referencing requests by Vasudevan for certain information). The Court has, however, reviewed the rest of Vasudevan's second amended complaint and, importantly, a separate five-page spreadsheet, incorporated into the complaint, in which he lists the allegedly defamatory comments. *See id.* ¶ 272 & Ex. 6 (dkt. 56-6). Each of these statements involves specific claimed missteps and/or performance deficiencies by Vasudevan. None of them impute a lack of integrity, competence, or fitness to perform the profession of an assistant instructional professor. False statements like these about particular claimed deficiencies or errors do not qualify; otherwise *every* negative comment about a worker, on a performance review or otherwise, would qualify as defamatory *per se*, which would stretch the law beyond recognizable bounds.

For these reasons, the Court dismisses Count 7—Vasudevan's defamation *per se* claim—including all of the sub-claims it contains. This time the dismissal is with prejudice, as Vasudevan has had a sufficient opportunity to assert viable defamation *per se* claims. For this reason, none of these claims may be included in Vasudevan's proposed third amended complaint.

**3. IHRA and IWA claims; individual defendants**

Next, the Court dismisses the individual defendants with prejudice from

Vasudevan's IHRA and IWA claims, Counts 5 and 6. The only proper defendant on a claim under the IHRA or a claim under the IWA is the plaintiff's "employer," which in this case is the University. *See, e.g., Kozlowski v. Greenridge Farm, Inc.*, 338 F. Supp. 3d 828, 834-35 (N.D. Ill. 2024) (IHRA; collecting cases); *Mack v. City of Chicago*, No. 16 C 7807, 2017 WL 951369 at *6 (N.D. Ill. Mar. 10, 2017) (IWA). The individual defendants may not be named as defendants in any IHRA and IWA claims in Vasudevan's proposed third amended complaint.

**4. Hybrid breach of collective bargaining agreement/ duty of fair representation claim**

Finally, Vasudevan's hybrid claim against Local 73 and the University in Count 4 for breach of the collective bargaining agreement and breach of the union's duty of fair representation is (again) deficient and is dismissed with prejudice.

The Court summarizes as follows the factual background, as alleged by Vasudevan in his second amended complaint. In 2024, the University advised Vasudevan that his continued employment was "uncertain absent progression" based on his fall 2024 review, which included a classroom observation. The observation was held in October 2024 and included negative comments. Vasudevan contended that he had not received the required fourteen days' advance notice of the identities of the observers. Actually four of the observers *were* identified before the deadline, but the other two were not identified until a day or two before the observation. Vasudevan went to Local 73, which filed a grievance on his behalf. The grievance requested a do-over of the observation. The University denied the grievance at step 3 of the grievance review process, and in January 2025, Local 73 recommended it for arbitration.

In early 2025, University personnel had further interactions with Vasudevan

regarding his performance review and his progression. He contends that the University made misrepresentations during this process. Ultimately a committee of faculty members voted against his progression. In April 2025, Local 73 filed a second grievance on Vasudevan's behalf, alleging that the University had violated the collective bargaining agreement and had evaluated him negatively as a result of his requests for accommodation under the ADA. The University denied the grievance at steps 1 and 2. In May 2025, based on the advice of a Local 73 representative, Vasudevan asked the University for a step 3 meeting, but the University never responded. Separately, Vasudevan signed a "terminal year" contract with the University in May 2025.

A mediation session was held in late July 2025, attended by Vasudevan along with Local 73 representatives. Vasudevan says that at the session, he told the union representatives that he would not sign a global release as part of a settlement. On July 29, the union's general counsel told Vasudevan that his grievances likely would be denied, told him that Local 73 would not pursue the matter further once there was a decision on the arbitration, and urged him to settle.

The arbitration was set for a hearing in August 2025. Evidently the arbitrator conducted further mediation. There were back-and-forth discussions and offers. Ultimately counsel for the University presented what she said was a final offer, which Vasudevan says was less than what he had identified as his "redline" (i.e., his bottom line). Nevertheless, two Local 73 representatives "repeatedly pressed Plaintiff to accept it as the University's final offer; [one representative] said, "Yes, I have a life." Vasudevan says that "[u]nder that pressure, [he] agreed to the framework and signed a hastily put together 'Term Sheet.'" 2d Am. Compl. ¶ 160.

The term sheet is a two-page document. The second page is the text of a confidentiality clause. Here is the first page:

I, Srinivasan Vasudevan, agree to the terms set forth below.

Srinivasan ____________, Dated: 8/4/2025

On behalf of the University, it agrees to the terms set forth below.

____________, Dated: 8/4/25 ____________

- Neutral reference letter;
- One course release during the quarter of his choosing in AY 25-26, notice before 5 pm on August 8, 2025;
- Full and general release of all claims, complaints, grievances (known and unknown);
- $50,000: one payment of $25,000 within 30 days of execution of the agreement; second payment of $25,000, within 30 days of the last day of his terminal appointment, subject to a second full and general release as set forth above;
- No admission of liability;
- Non-precedent setting;
- Withdrawal of grievances, charges, complaints;
- No re-hire/reapply
- Confidentiality of terms of agreement and negotiations leading to agreement as set forth below with the removal of the cross-reference to Section 4 until such time to as the Grievant can review the entire Agreement

1

*See* 2d Am. Compl., Ex. 12 (dkt. 56-12) at ECF p. 2 of 17.

The Court briefly pauses here to emphasize one significant point: Vasudevan *signed a term sheet that contemplated a general release of all of claims, complaints and grievances, "known and unknown."*

Vasudevan says that a couple weeks after the mediation, a Local 73 representative sent him a draft settlement agreement. The agreement called for payment of $50,000 to Vasudevan and his continued work at the University through August 2026—at his agreed-upon pay rate—under his terminal year contract. Vasudevan says the agreement "departed" from the term sheet because it included a release of all claims and grievances, known and unknown, as well as withdrawal of pending charges, and it also "added termination-for-cause, return-of-property, attorneys'-fees, and no-sue terms." 2d Am. Compl. ¶ 161. But the release, contrary to Vasudevan's contention, was exactly consistent with the term sheet. What Vasudevan calls a "no-sue" term was part and parcel of the release; it simply said that he would not sue the University. What he calls a "termination for cause" provision was simply a provision stating that if he were terminated for cause during his final year, he would not be paid. The "return-of-property" term called for Vasudevan, at the conclusion of his employment, to return any University property, including "all . . . physical property [he] received, prepared or helped prepare in connection with his employment." *Id.* Ex. 12 (dkt. 56-12) at ECF p. 6 of 17. And the "attorneys'-fees" provision was a mutually-applicable proposed term applicable only in the event of a breach. It read as follows: "If a court or jury determines that Vasudevan or the University has breached this Agreement, then the non-breaching party will be entitled to an injunction that restrains

any further violation of the Agreement and to all other relief available under the law. In addition, the party prevailing in litigation will be entitled to its court costs, litigation expenses and reasonable attorneys' fees." *Id.* at ECF p. 8 of 17.

Vasudevan alleges that he "objected the release was sweeping and asked it [to] adhere to the Term Sheet." 2d Am. Compl. ¶ 162. This, the Court notes, was a baseless objection: the term sheet, which Vasudevan had signed, *specifically contemplated* a general release, and that is what the draft settlement agreement included. Vasudevan says that he then sent edits and asked to proceed to arbitration on his grievances. The union replied that the agreement was consistent with what Vasudevan had agreed to at mediation, and it said that if he did not sign, Local 73 would withdraw the grievances. Vasudevan declined to sign the settlement agreement. Local 73 took no further action on the grievances and said it would not demand arbitration.

In Count 4, Vasudevan alleges that the University breached the collective bargaining agreement in connection with its progression review of his performance. *See* 2d Am. Compl. ¶ 252. In order for a union member like Vasudevan to sue his employer for breach of contract under section 301 of the Labor Management Relations Act, 29 U.S.C. §185, the member must sufficiently allege not just a breach of the CBA, but also that his union breached its duty of fair representation. *See, e.g., Vaca v. Sipes*, 386 U.S. 171, 186-87 (1967); *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914 (7th Cir. 2013). "[O]nly when the union has breached its duty to fairly represent the union member[ ] in [the] grievance process may the union member[ ] bring a claim against [his] employer." *Yeftich*, 722 F.3d at 911. A breach of the duty of fair representation occurs only when a union's actions vis-à-vis the member were arbitrary, discriminatory, or in bad faith.

*Vaca*, 386 U.S. at 190.

Relevant here, "declining to pursue a grievance as far as a union member might like isn't by itself a violation of the duty of fair representation." *Yeftich*, 722 F.3d at 916. A union member "has no absolute right to have his grievance arbitrated," and merely showing the grievance had merit will not suffice to establish a breach. *Vaca*, 386 U.S. at 195.

Whether a union acted in an arbitrary way is considered objectively, *Yeftich*, 722 F.3d at 916, and under an "extremely deferential standard" of review. *Taha v. Int'l B'hd of Teamsters, Local 781*, 947 F.3d 464, 470 (7th Cir. 2020). A court may not substitute its judgment for that of the union, even if hindsight reflects that the union could have made a better call. *Id.* at 471. A union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 57 (1991). A union "may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," *Vaca*, 386 U.S. at 191, but it "has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer." *Yeftich*, 722 F.3d at 917.

Vasudevan cannot meet this standard here. He appears to allege that Local 73 waited until a few days before the hearing to prepare for it, but there's nothing arbitrary or even unreasonable about that: a union representative (like a lawyer) with multiple matters to juggle quite reasonably may hold off final preparation until he or she is sure the particular matter is going forward. And in any event, that does not appear to be Vasudevan's central beef. Instead, he contends he was pushed into settling and that

the union then refused to go forward with arbitration when he balked at signing the final settlement agreement.

One way or another, what Vasudevan alleges comes nowhere close to "irrational" conduct by Local 73. First of all, irrespective of whether Vasudevan may have felt under pressure or later had a case of buyer's remorse, he undeniably signed the term sheet agreeing to settle. And the key point where he says the final proposed settlement agreement differed from the term sheet—the scope of the release—*is actually no different at all*: the term sheet specifically contemplated an all-encompassing release (i.e., a general release of all known and unknown claims and grievances), and that's what the settlement agreement provided for. The other terms that he Vasudevan were insignificant in the scheme of things. They were either part and parcel of the release and termination of the dispute or were relatively immaterial terms.

Putting that aside, the record as submitted by Vasudevan does not permit a plausible inference of arbitrary conduct by Local 73. When he declined to sign the agreement, Vasudevan asked the union's general counsel to assign the matter to a different staff attorney, set an arbitration hearing date, accommodate him by allowing him to appear virtually, and have a further strategy-related meeting. *See* 2d Am. Compl., Ex. 13 (dkt. 56-13) at ECF pp. 3-4 of 20. The general counsel responded as follows:

> Srini,
>
> None of these demands are acceptable to the Union. If you do not intend to abide by the terms mutually agreed to at mediation, the Union will withdraw the grievances.
>
> We have 38,000 members and a department of 3. You have received many hours of services from all of us. Shayla and Wes were able to

> obtain terms for you that were unachievable at arbitration. You agreed to them. You retained a private attorney to assist. He also agreed. Three days ago, you indicated that you had no suggested edits or questions on the actual settlement language.
>
> I'm unclear what, if anything, happened in the meantime, or if you just never intended to live up to your end of the agreement. Frankly, it doesn't matter at this point. We do not have the time or the resources to pursue this matter any further. This is the end of the process. I wish you the best of luck with everything.

*Id.* at ECF p. 3 of 20.

What Vasudevan describes here represents the opposite of arbitrary or irrational conduct. A union is allowed to determine, within reason, when and how its limited resources should be expended, and there was nothing arbitrary or irrational about Local 73's general counsel determining that it was not a wise use of the union's time or energy to fight further on a grievances where the union member had agreed to a settlement following mediation. *See Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (a union "has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer"). Further, a union does not breach its duty of fair representation simply because it settles a grievance short of arbitration. *See Vaca*, 386 U.S. at 192.

For the same reasons, there is no basis for a plausible inference of "bad faith" on the part of Local 73, which requires showing an "improper motive." *Taha*, 947 F.3d ta 472. Finally, Vasudevan cites no comparable matter or other facts that would provide a plausible basis for a claim of intentionally "discriminatory" conduct on the Union's behalf.

For these reasons, and because Vasudevan has had a sufficient chance to plead a viable hybrid claim, the Court dismisses Count 4 with prejudice.

## Conclusion

For the reasons stated above, the Court grants the defendants' motions to dismiss [dkt. 57 & 59]. Plaintiff's claims for breach of the collective bargaining agreement and breach of the union's duty of fair representation (Count 4) and his claims for defamation (Count 7) are dismissed with prejudice. In addition, all individual defendants are dismissed with prejudice from plaintiff's claims under the Illinois Human Rights Act and the Illinois Whistleblower Act (Counts 5 and 6). The remaining claims are dismissed for failure to comply with Rule 8(a)(2)'s "short and plain statement" requirement and because they lump multiple claims into single counts in contravention of Rule 10(b). Any motion for leave to file a third amended complaint—which may not include any of the claims or defendants the Court has dismissed with prejudice—must be filed by December 15, 2026 and must attached the proposed third amended complaint. The telephonic status hearing set for November 25, 2026 is vacated and reset to December 21, 2026 at 8:50 AM, using call-in number 650-479-3207, access code 2305-915-8729.

Date: November 24, 2026

MATTHEW F. KENNELLY
United States District Judge